Submitted on record October 25, accused permanently disbarred
November 29, 1977

In re Complaint as to the Conduct of
DALE W. PIERSON, *Accused.*
(No. 1327, SC 25367)
571 P2d 907

PER CURIAM.

## PER CURIAM.

In this disciplinary proceeding the accused is charged with converting to his own use funds of his client, Elissondoberry, which had been entrusted to him as attorney for the estate of Elissondoberry's deceased daughter, Wolf. The accused answered, denying the charges. The Trial Board found the charge was true and, with some reservations, recommended permanent disbarment. The Disciplinary Review Board, without such reservations, concurred in the recommendation of permanent disbarment. Having reviewed the record made before the Trial Board, we accept the recommendation that the accused be permanently disbarred.

Following Wolf's death in November 1975, Elissondoberry, as named beneficiary, became entitled to receive some $56,000 under three insurance policies on the life of Wolf. Shortly thereafter, the accused was retained both to act as attorney for the estate of Wolf and, as an adjunct thereto, to prepare a trust agreement placing the insurance proceeds in trust for the benefit of Wolf's two minor children. In April 1976 Elissondoberry endorsed and delivered to the accused checks from the life insurance companies for $56,000 plus. Elissondoberry and Wolf's sister understood from the accused that he would hold the money in a "trust account" pending drafting and execution of the trust agreement.

Although the accused and his law partner had an office clients' trust account, the accused deposited the $56,000 in what the Trial Board described as "his personal trust account" maintained at a branch of the United States National Bank of Oregon (USNB). The funds in the USNB account were totally under the control of the accused, and he personally executed the checks drawn thereon and kept the records of that account rather than having his office bookkeeper do so, as in the case of the law office accounts.

[ 515 ]

The accused maintained yet another checking account at an office of Western Security Bank (WSB), in which funds of his clients named Erwert were kept. This account was under the sole control of the accused, who personally kept the records thereof.

On or about May 26, 1976, the accused drew five checks on the WSB account payable to the Internal Revenue Service, totaling some $11,000, to be credited to the tax accounts of clients Erwert. On June 4, 1976, an overdraft of approximately $8,000 was charged on the WSB account.

About three days later the accused drew a check for $14,500 on the USNB account and deposited that sum in the WSB account. He had no authority from Elissondoberry or Wolf's sister to do so. He conceded before the Trial Board that the transfer of funds from one account to the other did not have "any purpose with regard to the handling of the estate of Toni Wolf, or the funds of, as have been described of Elizabeth M. Elissondoberry, for the benefit of the children of Toni Wolf, Deceased." Neither Elissondoberry nor Wolf's sister had ever authorized the withdrawal of the $14,500.

In midsummer, 1976, Elissondoberry was contacted by an I.R.S. agent, who inquired whether she had loaned funds to the accused. In the agent's presence, Elissondoberry telephoned the accused and asked him whether he had borrowed some of her funds from the trust account. He advised her he had, that he would repay them, and requested that she inform the agent that she had authorized the borrowing. Elissondoberry equivocated with the agent concerning authorization because she felt the agent was not being open and frank with her.

On August 9, 1976, after Elissondoberry had made a complaint to the Oregon State Bar and after a substitution of attorneys had been arranged in the matter of the Wolf estate, the accused deposited $14,542.13 of his own funds in the USNB account and,

with a check drawn thereon, purchased a cashier's check and delivered it to Elissondoberry and her new attorney. By the cashier's check full restitution was made to Elissondoberry.

The accused was called as a witness by the Bar and objected on the grounds of relevancy to questions concerning the type of matter he was handling for the Erwerts and his reason for the transfer of the money from the USNB account to the WSB account. There was no ruling on the objection to the first question, and the objection to the second question was overruled. The accused then refused to answer "on the grounds that the answer might tend to incriminate me." He then made the concession noted earlier that the transfer had no relation to the Wolf estate or children's trust purposes.

The charge that the accused converted to his own use the funds of his client Elissondoberry has been established.

The Trial Board's reservations concerning the recommendation of permanent disbarment as opposed to suspension were as follows:

"* * * [T]he Trial Board would have given serious consideration to a recommendation of suspension were it convinced that the charge against the accused was an isolated transaction; however, the Trial Board was convinced that the trust funds from one trust account were appropriated to make up a deficiency in another trust account which was a pattern of misconduct * * *."

An inference could be drawn that such "a pattern of misconduct" existed; however, for the purpose of this opinion we assume that the evidence does not establish such a pattern.

This is of no avail to the accused, however, in light of the history in this court of disbarment of lawyers, *qua* lawyers,[1] who convert to their own use money of

---

[1] Where an attorney at law has misused the funds of someone other than a client, we have not always ordered disbarment. *See, for example, In*

their clients. *See In re Bach,* 273 Or 24, 539 P2d 1075 (1975); *In re Dugan,* 272 Or 708, 538 P2d 938 (1975); *In re Celia L. Gavin,* 230 Or 187, 369 P2d 133 (1962); and *In re Chester R. Sloniger,* 224 Or 276, 355 P2d 975 (1960). It is true that in each of those cases the lawyer was accused and found guilty of more than one charge of misappropriation of funds, while the accused in the instant case is found guilty of only one conversion. We have no reason to believe, however, that any member of the Bar of this state has been led by those decisions to consider or presume that a single instance of misappropriation of a client's funds will be tolerated. If any member entertains such a conception, let his mind be hereby disabused thereof. We hold that a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment.

We have acted with complete awareness that full restitution has been made, but that cannot alter the result. *Compare In re Albright,* 274 Or 815, 549 P2d 527 (1976); *In re George C. Staples,* 259 Or 406, 486 P2d 1281 (1971); and *In re C. E. Wheelock,* 233 Or 236, 377 P2d 858 (1963), for the proposition generally that discipline should not be dependent upon the lawyer's financial ability to rectify the results of his unethical conduct.

The accused here has been a member of the Bar for more than a quarter of a century. What led him to commit this wrongful act is unknown to us. He gave no explanation, and the evidence otherwise would serve only as a basis for speculation as to his motivation.

The conduct of the accused was unethical and in violation of the standards of professional conduct established by law and by the Bar and was such conduct that, if he were now applying for admission to

*re Kenneth W. Stodd,* 279 Or 565, 568 P2d 665 (1977), and *In re Gregg,* 252 Or 174, 446 P2d 123, 448 P2d 547 (1968). The wisdom of the distinction may be open to question. Such acts may in the future not be treated so leniently. *Compare, In re John W. Pennington,* 220 Or 343, 348 P2d 774 (1960).

the Oregon State Bar, his application should be denied. Our duty is clear. We determine that the accused be permanently disbarred from the practice of law in this state.

It is so ordered.