Submitted on record September 3, accused suspended
for 60 days December 2, 1981

In Re: Complaint as to the conduct of
## HECTOR E. SMITH,
*Accused.*

(OSB 79-24, SC 27739)

636 P2d 923

Hector E. Smith, Pro Se.

Larry O. Gildea, Eugene, and Jack A. Billings, Eugene, for the Oregon State Bar.

PER CURIAM

Lent, J., concurred and filed an opinion.

## PER CURIAM

The Oregon State Bar filed a complaint against Hector E. Smith, a member thereof, accusing him of unethical conduct in four separate causes:

(1) Improper use of a notary commission in violation of the standards of professional conduct. DR 1-102.

(2) Conflict of interest and not zealously representing a client. DR 5-105 and DR 7-101 (A)(3).

(3) Conversion of an automobile and failure to follow client's instructions. DR 1-102 and DR 7-101 (A)(3).

(4) That the conduct and course of conduct alleged in the first three causes, taken in the aggregate, were prejudicial to the honor and integrity of the practice of law in this state.

The trial board found Smith guilty of the first and second causes and not guilty of the third and fourth causes. It recommended that Smith receive a public reprimand.

The seven member Disciplinary Review Board found Smith guilty of the first three causes and not guilty of the fourth cause. It recommended that Smith be suspended from the practice of law for sixty days.

All four of the causes are the direct result of Smith's representation of Rufus Frederick van Deinse, II, and a person originally known to Smith as Bruce W. Ericksen.

Smith and van Deinse first became acquainted in about 1954 when van Deinse was 14 years of age. At that time Smith enrolled van Deinse in the Hyland Bagpipe Band and taught him to play the drums. In the years that followed van Deinse's parents died and he inherited a substantial sum of money. Smith became his personal, financial and legal advisor. Van Deinse described Smith as a "father figure."

Smith first became acquainted with Ericksen in 1976 when he represented him in a claim resulting from an automobile collision. Ericksen was described as being 6 feet 5 inches tall and weighing 280 pounds with a domineering personality. Ericksen needed money to finance his used car business in Junction City. Smith arranged a meeting between Ericksen and van Deinse who had money to loan.

Ericksen borrowed the sum of $6,000 from van Deinse and Smith "hand wrote" the promissory note for the transaction. Smith received a finders fee in the sum of $450 in the form of an additional promissory note from Ericksen. The $6,000 was repaid by Ericksen from proceeds of the settlement of the personal injury action.

In 1977 Ericksen became interested in starting a bingo operation and employed Smith to do some legal research on the subject.[1] Smith represented Ericksen and drafted an employment contract between Ericksen and Center for Educational Reform, Inc., an Oregon nonprofit corporation. The employment contract was executed on August 31, 1977, and provided that the corporation employed Ericksen as the "director" to take "active charge and complete, full control of the administration, management and operation of bingo games * * *." The bingo operation was located in Springfield under the name of "Bingo Center."

Ericksen needed to borrow money to buy equipment for the bingo operation. On September 19, 1977, van Deinse, through Smith's trustee account, loaned Ericksen the sum of $5,000. On the same date Smith prepared for delivery to van Deinse and his wife a promissory note and Uniform Commercial Code financing statement. Ericksen signed the promissory note only as an individual, but signed the financing statement only as "Director"[2] of "Center for Educational Reform, Inc." The financing statement was not filed because Ericksen failed to furnish Smith with a supplemental list of the equipment purchased with the loan proceeds.

By March 1, 1978, Ericksen needed more money to buy additional equipment for the bingo operation. By this time van Deinse had become friendly with Ericksen and was working at the Bingo Center as a trainee or assistant manager. No part of the $5,000 promissory note had been

---

[1] Effective July 27, 1977, the Oregon Legislature passed Chapter 850 Oregon Laws 1977 permitting charitable, fraternal and religious organizations to operate bingo games.

[2] It appears that Ericksen was the "director" or "manager" of the bingo operation and not a member of the board of directors of the corporation as provided in ORS 61.121. This is not an issue in this case.

paid. Ericksen borrowed an additional $7,000 from van Deinse and Smith consolidated the two debts into a new promissory note for $12,000.[3] The new note was executed by Ericksen only as "Director" for "Center for Educational Reform, Inc." Smith later testified that there was no collateral or security for the promissory note because van Deinse did not want any.

On September 6, 1978, at approximately 10:30 p.m., suddenly and without any warning, agents of the Federal Bureau of Investigation and the local police blocked off the street near the Bingo Center in Springfield and arrested Ericksen. Van Deinse, who was "calling bingo" at the time of the arrest, telephoned Smith. Later that night Smith contacted Ericksen at the jail and found out for the first time that Ericksen was in fact Patrick Benjamin Paddock who was wanted for escaping nine years previously from a federal penitentiary in West Texas. Ericksen-Paddock had been on the FBI's most wanted list for the escape and an additional armed bank robbery charge. After seeing Ericksen in the jail, Smith spent the next three hours at Ericksen's residence taking care of the dog, personal effects and securing the house and parked vehicles.

During the days immediately following the arrest, Smith visited with Ericksen-Paddock in the jail several times. One of the subjects of these visits was the operation of the Bingo Center. Ericksen-Paddock wanted the business continued by van Deinse under the supervision of Smith. To further this objective Smith was instructed to prepare a general power of attorney from "Bruce W. Ericksen" to Smith with this additional provision:

> "To act in my stead in regard to the operation of and management of the Bingo Center, and to endorse my name on checks related to the Bingo Center Account No. 011557 6, First National Bank of Oregon, Springfield Branch."

There was no notary public at the jail and Smith did not want to acknowledge "Ericksen's" signature because he was a party to the power of attorney. Therefore, Ericksen signed the document and Smith returned with it

---

[3] It came to light later that the large portion of van Deinse's wages had not been paid, but there is nothing in the record to indicate that Smith knew this when he prepared the $12,000 promissory note.

to his office where he asked his secretary to notarize the signature. Smith explained to the secretary that this was an emergency because he had just come from a hearing before the Federal magistrate where it was ordered that Ericksen-Paddock be removed from the state and that the payroll at the Bingo Center was due. The secretary, who had been employed by Smith for 17 years, was reluctant but notarized the signature as of September 7, 1978.

On the evening of September 8, 1978, to further the plan of Ericksen-Paddock for the continued operation of the bingo business, van Deinse and Smith met with the three women who were directors of Center for Educational Reform, Inc. The directors acknowledged that the corporation had received the original $5,000 loan from van Deinse to Ericksen, but were surprised and strongly denied that it had received the subsequent $7,000 loan. They also denied that there were any wages due van Deinse and refused to hire him as the manager of the Bingo Center.

On Saturday morning, September 9, 1978, Smith went to the Lane County jail and confronted Ericksen-Paddock with the fact that directors of Center for Educational Reform had denied any knowledge of the $7,000 loan. When pressed for information, Ericksen-Paddock replied that $7,000 went for "juice." He would not give any further explanation.

At the time of Ericksen-Paddock's arrest, he was the owner of six automobiles.[4] He instructed Smith and van Deinse to "round up" these vehicles and secure them against vandalism and theft. Smith obtained the titles and a part of the keys from Ericksen's residence. One of the vehicles, a 1969 Ponitac, was parked at the Bingo Center at the time of the arrest and one of its tires had been slashed. A 1968 Mustang was in a paint shop and a 1968 Firebird was in a body shop. A 1973 Gremlin was in the hands of Ericksen's ex-girlfriend and had to be repossessed by Smith with the aid of the Springfield police.

---

[4] These automobiles ranged from 1968 through 1973 models. Apparently Ericksen-Paddock had gone out of the used car business, but as a sideline or hobby he was "refurbishing" older model cars. In an affidavit in the record he referred to some of the vehicles as "Customized Ericksen Special Edition Showcar."

To obtain possession of all the automobiles van Deinse and Smith were required to pay the approximate sum of $740 from their own funds. Smith obtained the certificates of title to all of the automobiles from Ericksen's residence. Ericksen endorsed each of the certificates in blank and redelivered them to Smith. Five of the automobiles were then stored in a barn owned by van Deinse. Mechanics' tools and miscellaneous equipment and supplies were removed from the residence Ericksen had occupied to van Deinse's barn.

On Monday, September 11, 1978, Smith went to the jail and had Bruce W. Ericksen execute two separate sets of a Uniform Commercial Code financing statement, form UCC-1. Each set of forms was signed twice: (1) "Bruce W. Ericksen, Debtor, dba Ericksen Enterprises," and (2) "Center for Educational Reform, Inc. by Bruce W. Ericksen, Director." The debtors on each form were listed as Bruce W. Ericksen and Center for Educational Reform and the secured party was listed as Rufus F. Van Deinse. One set of forms covered bingo equipment described in detail and located at the Bingo Center address in Springfield plus "miscellaneous mechanics, tools, equipment and supplies" located at van Deinse's address. The other set of forms covered five automobiles identified by serial number and Oregon license plate number.

Smith explained to Ericksen that the UCC-1 forms probably did not create a valid security interest in the bingo equipment and miscellaneous tools because there was no security agreement or possession. However, it was Smith's opinion that there was a valid security interest in the automobiles because they were in van Deinse's possession. Smith thought that this was the best course of action to secure some collateral for the balance due on the $12,000 promissory note of March 1, 1978, from the Center for Educational Reform to van Deinse.[5]

Sometime between September 14, 1978, and September 18, 1978, the federal authorities transported Ericksen-Paddock to the county jail in El Paso, Texas.

---

[5] Van Deinse had received payments of $500 each month on this note from May through September of 1978 reducing the principal balance to approximately $10,173.

The 1969 Pontiac automobile that was parked with a slashed tire at the Bingo Center at the time of Ericksen-Paddock's arrest is a separate story. It was not included in the list of autombiles on the UCC-1 form executed on September 11, 1978, by Ericksen to give van Deinse some collateral security. It is the subject of the Oregon State Bar's third cause of complaint against Smith alleging that he converted the vehicle to his own use.

Although Ericksen-Paddock claimed that the 1969 Pontiac was worth $3,000, he told Smith that he had agreed to sell it to Tamara Shafe for the sum of $2,000 at the rate of $100 per month with nothing down. Shafe was an employee of the Bingo Center. The payments were to be made to Shirley Daniels who was Ericksen's current girlfriend.

In the days immediately following Ericksen's arrest, van Deinse moved the 1969 Pontiac to Smith's office. To get the vehicle in operating shape, van Deinse and Smith were required to expend $154.45 of their own money. Van Deinse bought a new tire and a battery. Smith had the carburetor repaired at a cost of $28.50. Smith did not have any storage at his office so he moved the Pontiac to his home where he used it from time to time. Smith refused to give the 1969 Pontiac to Shafe until she paid the approximate sum of $740 which van Deinse and he were out-of-pocket to obtain possession of all six of the vehicles. Shafe refused to pay claiming she was entitled to possession.

At one point, Shafe presented Smith with an alleged bill of sale conveying the 1969 Pontiac from Ericksen to her. Smith could not determine if Ericksen's signature was authentic.

In late September, 1978, van Deinse told Smith that he had been informed that some people at the urging of Ericksen-Paddock were going to take all of the vehicles including the 1969 Pontiac by force. As a result of this information, Smith, on October 2, 1978, transferred the title of the Pontiac to himself through the Department of Motor Vehicles. He also obtained insurance on the automobile.

At about 7:00 p.m. on October 8, 1978, Tamara Shafe and her husband came to Smith's home. Smith described the events as follows:

"Now, about the vehicle. I had refused to deliver the car to the Shafe's without payment for the cash monies. My next contact with them was when they appeared at my home and were able to, by means totally unknown to me, to find a key to run the vehicle. A key that was hidden in a magnetic container, and while Ms. Shafe engaged me at the front door of my home, her husband went to my garage and started the vehicle, and my wife alerted me as to what was happening. I heard the hood of the vehicle drop, got to the alley in time just to see the husband backing out of and starting away. I tried to hold him, the windows were locked—I should say up and the doors locked—and I grabbed onto the handle of the vehicle and was dragged about 60 feet to the consternation of the various and sundry neighbors in the area."

On October 10, 1978, Smith wrote to Ericksen-Paddock at the El Paso County jail enclosing a check in the amount of $301.57 representing the balance of the checking account. Smith also terminated the attorney-client relationship and acknowledged that Ericksen-Paddock had revoked the power of attorney.

Smith filed a suit in the Circuit Court for Lane County against Tamara Shafe seeking a declaration of ownership of the 1969 Pontiac. The complaint in the suit is not a part of the record, but Smith described it as follows:

"What I pleaded was this: Was that I was a practicing attorney; that in consideration of moneys expended on behalf of and legal services rendered to one, Patrick Benjamin Paddock, alias Bruce Ericksen, the owner of said vehicle, plaintiff held said vehicle and the endorsed title to same; held both and that on the belief that on the second day of October, I insured the vehicle and surrendered the endorsed title to the Oregon Motor Vehicle for title in my name."

After the Smith power of attorney was revoked, Ericksen-Paddock gave a new power of attorney to Shirley Daniels who had been his girlfriend at the time of the arrest. Daniels filed an action against Smith for damages claiming that he had converted four of the vehicles to his own use. The four vehicles[6] were the same vehicles that had

---

[6] The UCC-1 form executed on September 11, 1978, by Ericksen listed five vehicles. Smith testified that a white station wagon had been delivered to Shirley Daniels.

been in the possession of van Deinse since shortly after Ericksen-Paddock's arrest. Smith was able to settle the Daniels action for damages by dismissing his declaratory judgment suit against Shafe.

A complaint from Texas by Ericksen-Paddock to the Oregon State Bar resulted in these proceedings.[7]

The Oregon State Bar for the first cause of complaint in effect alleged that on or about September 7, 1978, Smith, in violation of DR 1-102, had his secretary notarize an acknowledgement on a power of attorney signed by Bruce W. Ericksen when the secretary did not of her own knowledge know that Ericksen had signed the instrument freely and voluntarily.

Smith in his answer to the first cause explained and justified the conduct on the basis of an emergency. It was alleged that Smith had been informed that Ericksen-Paddock was going to be "immediately transported to Texas" by the Federal authorities and the power of attorney was necessary to pay several employees.

ORS 194.310(2) provides:
"No Notary Public or commissioner of deeds, in the exercise of the powers or in the performance of his duties, shall practice any fraud or deceit, or willfully make any false certificate, acknowledgment or jurat."

Disciplinary Rule 1-102 states:
"(A)   A lawyer shall not:
"   * * * * *.
"(5)  . Engage in conduct that is prejudicial to the administration of justice."

---

[7] An affidavit executed by Bruce W. Ericksen in the County of El Paso, Texas, on October 10, 1978, in part states:

"* * * Smith is in direct violation of his attorney-client cannon, ethical behavior standard and liable for criminal prosecution. It is my contention that by the conversion and use by himself of said * * * vehicles, he has forfeited all rights to bill me for representation and/or services.

"   * * * * *.

"It is apparent that Smith believes that Bruce W. Ericksen being in Federal custody, 3,000 miles from Eugene, Oregon, would be incapable and/or otherwise occupied, to the extent that he would allow Smith to take criminal advantage of himself and both Shafe and Daniels. Relying on Shafe and Daniels being women and unlettered in law to preclude any protest on their part."

Smith, by persuading his secretary to make a false acknowledgement, engaged in conduct that prejudicial to the administration of justice.

There is no provision in the law which excuses compliance with ORS 194.310(2) on the basis of emergency. We agree with both the Trial Board and the Disciplinary Review Board that Smith is guilty of the first cause of complaint. See, *In re Kraus,* 289 Or 661, 616 P2d 1173 (1980); *In re James Christian Simms,* 284 Or 37, 584 P2d 766 (1978); *In re Evelyn N. Scott,* 255 Or 77, 464 P2d 318 (1970); *In re Monte E. Walter,* 247 Or 13, 427 P2d 96 (1967); *In re Jason Lee,* 242 Or 302, 409 P2d 337 (1965).

The second cause of complaint in effect alleged that Smith as an attorney represented two different clients (van Deinse and Ericksen-Paddock) on matters where the clients had adverse positions:

(1)  The $6,000 loan in 1976 from van Deinse to Ericksen to finance Ericksen's automobile business.

(2)  The $5,000 loan in 1977 from van Deinse to Ericksen to open and capitalize the Bingo Center in Springfield.

(3)  The additional $7,000 loan in 1978 from van Deinse to Ericksen for the bingo operation.

(4)  The preparation and execution of the UCC-1 financing statements in September, 1978, after Ericksen-Paddock was arrested and in jail.

It was further alleged that the conduct of Smith was "unethical and unlawful and in violation of DR 5-105 and DR 7-101 (A)(3)."

Smith's answer to the second cause denied that his conduct was unethical and by way of justification and explanation alleged that on September 6, 1978, he discovered for the first time that Ericksen-Paddock had a long list of prior convictions and was wanted on an escape charge from a federal correctional facility in the Western District of Texas and an armed bank robbery charge in the Northern District of California.[8]

---

[8] Smith's answer to the second cause also alleged that Ericksen-Paddock had been "placed on FBI Ten Most Wanted list in June 1969 and removed (in) July 1977 for lack of leads."

The chief thrust of Smith's brief in this court seems to be that van Deinse and Ericksen-Paddock consented to dual representation by Smith both expressly and by implication.

Disciplinary rule 5-105 provides in pertinent part as follows:

"Refusing to Accept or Continue Employment if the Interest of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105 (C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105 (C).

"(C) In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

Disciplinary Rule 7-101 (A)(3) provides:

"(A) A lawyer shall not intentionally:
(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102 (B).[9]

---

The answer also alleged that in April, 1979 Ericksen-Paddock had been released on parole from his escape conviction and that van Deinse and Ericksen-Paddock had met and settled all their differences.

[9] Disciplinary rule 7-102 (B) provides as follows:

"(B) A lawyer who receives information clearly establishing that:

"(1) His client has, in the course of the representation perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal, except when the information is protected as a privileged communication.

"(2) A person other than his client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal."

This court in *In re Harry D. Boivin*, 271 Or 419, 424, 533 P2d 171 (1975) explained DR 5-105:

"3. To satisfy the requirement of full disclosure by a lawyer before undertaking to represent two conflicting interests, it is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them, but he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each to have independent counsel, with undivided loyalty to the interests of each of them. See Wise, Legal Ethics 77 (2d ed 1970); Patterson and Cheatham, The Profession of Law, 232, 235 (1971); Drinker, *supra* at 121; and Annot., 17 ALR3d 835, 838-39 (1968)."

There is no evidence in the record that van Deinse and Ericksen-Paddock expressly agreed to Smith's dual representation. Smith did not during any of the four separate transactions explain to them the nature of the conflict of interest so that they could understand the reasons why it might be desirable for each to have independent counsel.

We agree with the following findings and conclusion of the Trial Board:

"From the commencement of the relationship between Mr. Van Deinse and Mr. Ericksen until the Accused's discharge by Mr. Ericksen on September 14, 1978, the Accused did not explain the potentiality for conflict and the possibly divergent interests of Mr. Van Deinse and Mr. Ericksen during their three loan transactions, nor did the Accused receive the verbal or written consent of each such client to the dual representation undertaken. However, Mr. Van Deinse and Mr. Ericksen evidenced by their conduct during joint conferences with the Accused that they acquiesced and agreed to such dual representation by the Accused.

"It is the unanimous opinion of the Trial Board that the aforementioned conduct on the part of Accused violated Disciplinary Rule 5-105 (C) in that the Accused failed to obtain the express consent of each client for which he was providing multiple representation. Further, the Trial Board unanimously concludes that the Accused's conduct of September 11, 1978, directly evidenced the actual conflict between the interests of Mr. Van Deinse and Mr. Ericksen and evidenced the Accused's direct participation in an actual conflict of interest contrary to Disciplinary Rule 5-105 (B)."

We concur with the Trial Board and the Disciplinary Review Board that Smith is guilty of the second cause of complaint.

The third cause of complaint alleged that on September 6, 1978, while Ericksen was in jail, he instructed Smith as his attorney to convey a 1969 Pontiac to a third party pursuant to a previous agreement. Ericksen signed the title to the vehicle in blank and delivered it to Smith who, contrary to Ericksen's instructions, transferred the title to the 1969 Pontiac to himself and kept possession of the vehicle as its owner. It was further alleged that the conduct was in violation of DR 7-101 and DR 1-102.[10]

Smith answered that he had explained and justified his conduct in his answers to the previous causes of action and denied that the conduct was unethical.

Smith's brief in this court states that he claimed an attorney's possessory lien on the 1969 Pontiac under ORS 87.430[11] He contends that all he intended to protect under the lien was the actual cash out-of-pocket and that he was not claiming an attorney fee for his services. Smith expressed his position:

"Indeed, Accused's entire conduct throughout was to equalize the rights between Ericksen and van Deinse, the

---

[10] Disciplinary rule 1-102 provides that:

"(A) A lawyer shall not:

"(1) Violate a Disciplinary Rule.

"(2) Circumvent a Disciplinary Rule through actions of another.

"(3) Engage in illegal conduct involving moral turpitude.

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

[11] ORS 87.430 states:

"An attorney has a lien for his compensation whether specially agreed upon or implied, upon all papers, personal property and money of his client in his possession for services rendered to the client. The attorney may retain the papers, personal property and money until the lien created by this section, and the claim based thereon, is satisfied, and he may apply the money retained to the satisfaction of the lien and claim."

gross imbalance of which rested with Ericksen's failure to disclose his fugitive status and the risk to van Deinse.

"Accused acted without any view of personal gain in an extraordinary situation from which the evidence already indicates was a dire emergency and necessity * * *."

Smith also contended that van Deinse acted as his agent in paying the expenses on Ericksen-Paddock's automobiles. A further somewhat inconsistent position was that van Deinse owed Smith a balance previously incurred for attorney fees and that Smith gave van Deinse credit for the amounts he paid for the repair and release of the Ericksen vehicles.

The Trial Board and the Disciplinary Review Board did not agree on the third cause of complaint. The Trial Board in effect found that Smith obtained and kept possession of the 1969 Pontiac under lawful and ethical circumstances and therefore found Smith not guilty of the third cause. On the other hand, the Disciplinary Review Board found that Smith intentionally disregarded Ericksen-Paddock's instructions to deliver the 1969 Pontiac to Tamara Shafe and therefore was in violation of DR 7-101 (A)(3) and guilty of the third cause of complaint.

We agree with the Disciplinary Review Board that Smith is guilty of the third cause of complaint.

There is some confusion in the record as to exact times and dates, but the most reasonable inferences to be drawn are: On the night of September 6, 1978, at the jail, Ericksen-Paddock told Smith that he had by previous agreement sold the 1969 Pontiac to Tamara Shafe and instructed Smith to convey the vehicle to her. Prior to September 11, 1978, van Deinse and Smith had expended $154.45 of their own money on the 1969 Pontiac and had moved it to Smith's residence. Also prior to September 11, 1978, van Deinse had expended approximately an additional $580 of his own money on Ericksen-Paddock's five other automobiles and had moved them to a barn on his farm. Then on September 11, 1978, Ericksen executed for the benefit of van Deinse a UCC-1 form covering the five vehicles stored in the barn as collateral security for a prior $12,000 promissory note.

The 1969 Pontiac was not included in the UCC-1 form as collateral security. Ericksen was not personally liable on the $12,000 promissory note and had not previously given any personal security for the payment of the debt.

We have previously found under the second cause of complaint that Smith had a conflict of interest in representing both Ericksen-Paddock and van Deinse in the UCC transaction on September 11, 1978. It was Smith's conduct which set up and made the 1969 Pontiac available for the alleged attorney's lien. Ericksen had told Smith that any of the other five vehicles were available to cover his expenses.[12] But for Smith's avowed purpose "to equalize the rights betwen Ericksen and van Deinse," the 1969 Pontiac would have been conveyed to Tamara Shafe, four of the other vehicles would have been available to van Deinse as collateral security, and the fifth vehicle would have been available to Smith to cover his expenses.[13]

Here we have a lawyer who has enough information to be a witness for either party acting as judge and jury "to equalize" their rights while acting as an attorney for both parties. We hold that Smith cannot claim an attorney's lien on the 1969 Pontiac under these circumstances. Smith's conduct under this cause of complaint does not neatly fit into any of the prohibitions of DR 1-102 but does violate DR 7-101 (A)(3) in that there was prejudice or damage to his client Ericksen. Smith's failure to follow Ericksen's instructions to convey the vehicle to Shafe could have caused Ericksen to breach his agreement with Shafe. Furthermore, the attorney's lien must fail because Smith's claim for $734.45 resulted from expenditures by himself and van Deinse on Ericksen's automobiles and was not for "compensation * * * for services rendered to the client" as provided by ORS 87.430.

---

[12] At the hearing before the Trial Board Smith testified as follows:

"Q. Now, Ericksen testified that he told you that any of those other vehicles were available to be sold at a realistic price or you could keep one to cover your expenses and so forth, was that true?

"A. That's my understanding of it, yes."

[13] Apparently there was no indebtedness owing on any of the vehicles to third parties. Ericksen-Paddock in his affidavit executed in El Paso, Texas, on October 10, 1978, placed a value of $18,000 on five of the vehicles including the 1969 Pontiac.

We agree with both the Trial Board and the Disciplinary Review Board that Smith is not guilty of unethical conduct in the aggregate as charged in the fourth cause of complaint.

■ The only matter remaining in this case is the question of a proper sanction. The Trial Board recommended that Smith receive a public reprimand and the Disciplinary Review Board recommended that he be suspended from the practice of law for 60 days.

By way of mitigation there are many things to be said in Smith's favor. The Trial Board found that although Smith's conduct "was unethical * * * his honesty, candor and personal integrity as expressed during the investigatory as well as hearing stages of this matter exemplify a high degree of professional honor and integrity."[14] From our review of the record, we agree.

The Trial Board also found that Smith commenced this representation of Ericksen and van Deinse in good faith and at no time did he "take advantage of any actual or potential conflict of interest for his own economic gain."

Smith did not get paid for his services to Ericksen-Paddock. There was no conflict of interest in Smith's services regarding much of the time he spent on behalf of

---

[14] The Trial Board also "unanimously found that the credibility of Mr. Ericksen was highly suspect."

At the hearing before the Trial Board on October 28, 1980, Bruce W. Ericksen testified as follows:

"Q. You had been convicted of armed bank robbery?

"A. Yes.

"Q. That you had previously been convicted of auto theft?

"A. Yes.

"Q. That you had previously been convicted of forgery?

"A. Yes.

"Q. That you have previously been convicted of confidence crime charges?

"A. Yes.

"Q. At the time of your arrest, you had been an escapee from the West District of Texas for approximately nine years?

"A. Yes. I've been No. 1. Also had three killings that don't appear on that, for seven and a half years."

Ericksen-Paddock—for example, the criminal charges. At the request of counsel for the Oregon State Bar, Smith prepared and there was received in evidence a "time resume" showing that between September 6, 1978, and September 21, 1978, he worked 38 1/2 hours on behalf of Ericksen-Paddock.

On October 10, 1978, Smith wrote to Ericksen-Paddock in El Paso County jail saying in part:
" * * * I feel the money is yours and the devil take the hindmost, so I'm sending you a cashier's check for the balance, and am closing * * * your files and the attorney-client relationship.

"You may also count our friendship as terminated."

The check was for $301.57. Smith did not attempt to claim an attorney's lien on the funds.

On the other hand, as the Disciplinary Review Board points out, the acts of unethical conduct by Smith charged in the first three causes of complaint were all deliberate.

For a man who has practiced law in Oregon since 1957, Smith still lacks understanding of the Disciplinary Rules concerning conflicts of interest.. Smith filed a pro se brief in this court and a short paragraph near the end of the brief reads:
"The Accused intended to protect each client and that he did so with reasonable competence."

From that statement Smith must have meant that when gauged by hindsight, everything turned out "reasonably well." It is true that Tamara Shafe eventually received the 1969 Pontiac although Smith himself literally lost some hide in the incident. In April, 1979, Ericksen-Paddock returned to Springfield on parole from the escape charge and van Deinse gave him back the rest of the vehicles and miscellaneous property on the promise of future payment of the promissory note and back wages. At the hearing before the Trial Board on October 28, 1980, Rufus van Deinse testified that approximately one month previous, while represented by a different lawyer, he had obtained a judgment against Center for Educational Reform. He did not mention the amount of the judgment, but he did say

that Ericksen-Paddock testified on his behalf and that as a result of a previous writ of attachment, certain property of Center for Educational Reform had been seized and that Ericksen-Paddock wanted to buy the property from him for $5,000.

It is ordered that Smith be suspended from the practice of law in this state for a period of 60 days. Costs awarded to Oregon State Bar.

**LENT, J.,** concurring.

I write separately because I believe the opinion of the court neglects a loose end with respect to the third cause of complaint involving the accused's conduct relating to the 1969 Pontiac. The charge is that the accused converted the vehicle. We have found the accused to be guilty on that charge.

Where lawyers have converted to their own use money of their clients, we have ordered disbarment. *See* the cases cited in *In re Pierson,* 280 Or 513, 517-518, 571 P2d 907, 908-909 (1977). In *Pierson* we stated:

"We hold that a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment."

280 Or at 518, 571 P2d at 909. I see no reason to draw a distinction between conversion of money and conversion of personal property of some other kind, such as an auto with an apparent market value of $2,000; therefore, if we were dealing with the same kind of conversion here as in the cases to which reference is above made, I would consider disbarment to be the appropriate sanction. In those cases, however, the respective lawyers, without any colorable claim of right, misappropriated their clients' personal property.

In character or degree, conversion may occur on a spectrum from the most outright, blatant kind of theft to what may be regarded as innocent conversion. The latter kind of conversion is exemplified by the bona fide purchaser for value, without notice, who buys from a thief. The law quite rightly differs in its treatment of converters with respect to recoverable damages according to the kind of conversion shown to have occurred. *See, e.g., Fredeen v.*

*Stride,* 269 Or 369, 525 P2d 166 (1974), where we held that as against the knowing converter the plaintiff could recover judgment for the market value of the chattel, damages for mental anguish and punitive damages, but as against the co-defendant innocent converter who acquired the chattel from the knowing converter, the plaintiff could recover judgment only for the market value of the chattel.

It appears to me that our statement quoted above from *Pierson* may have been too broad, given the range of conduct which may be embraced in the tort of conversion. I doubt very much that we would disbar a lawyer found to be guilty of an innocent conversion. That is not to say that our decision in Pierson is to be questioned. That was not a case of innocent conversion.

This leads me to an examination of the nature of the conversion in the case at bar. From the evidence I would infer that this conversion was at neither end of the spectrum. It lies somewhere between the ends because there appears to have been a colorable claim of right to act as did the accused. Were I convinced that the accused had not asserted that claim in good faith, I should have no hesitancy in treating him in the same manner as we did the accused in *In re Pierson, supra,* and I assume that the rest of the court should be of like mind.

In the recent past we have suspended some lawyers found guilty of violation of the disciplinary rules relating to conflicts of interest. *See, In re Robertson,* 290 Or 639, 624 P2d 603 (1981) (30 days); *In re Scannell,* 289 Or 689, 617 P2d 256 (1980) (60 days); *In re Bartlett,* 283 Or 487, 584 P2d 296 (1978) (six months); *In re Hendricks,* 282 Or 763, 580 P2d 188 (1978) (60 days); and *In re Brown,* 277 Or 121, 559 P2d 884, *reh. denied* 277 Or 731, 561 P2d 1030 (1977) (30 days). In the present case, the accused stands guilty of violating the rules pertaining to conflicts of interest and, in addition, of converting property of another. I concur in the action of the court in ordering suspension for 60 days.