Submitted on record and briefs September 4, accused disbarred September 24, 1985

In re Complaint as to the Conduct of
# THOMAS E. LAURY,
*Accused.*

(84-19, 84-38, 84-51; SC S31724)

706 P2d 935

Thomas O. Moe, Portland, for the accused.

William M. Tomlinson, Portland, and George A. Riemer, General Counsel, Oregon State Bar, Portland, for the Oregon State Bar.

PER CURIAM

## PER CURIAM

The issue is whether, for commingling and eventually converting to his own use the funds of his clients, the accused should be suspended from the practice of law rather than being disbarred. The accused contends that disbarment is not a proper sanction because of the accused's alcohol dependency during the period in which the commingling and conversion occurred. We hold that he must be disbarred.

The Oregon State Bar (Bar) filed a formal complaint containing three causes, and the complaint and notice to answer were served on the accused on November 13, 1984. Despite the fact that both the notice and BR 4.3 required that the accused answer the formal complaint within 14 days of service, the accused did not answer until February 22, 1985. The hearing before the Trial Panel was on March 13, 1985.

The first cause in the Bar's complaint alleged violation of DR 6-101(A)(3)[1] arising out of allegations that the accused undertook to represent plaintiffs Cook and McDowell in certain civil litigation in August of 1980, that the accused neglected the case "and failed to keep [the plaintiffs] informed of his whereabouts and of the status of the litigation he had filed on their behalf." The complaint alleged that the accused's services were terminated by his clients in August of 1983, at which time the accused turned over the file to a former partner of the accused for transmittal to the clients.

The second cause charged that the accused was retained to represent one of the defendants in a civil cause. The plaintiff was represented by attorney Berne. Just before trial was to occur, alleged the Bar, the parties agreed that upon payment to plaintiff by the accused's client of the sum of $500 the plaintiff would execute a covenant not to sue the accused's client and dismiss the claim against him. The Bar alleged that on July 26, 1983, Berne mailed to the accused a covenant not to sue executed by the plaintiff and advised the accused that when the $500 was paid Berne's client would dismiss as to the

---

[1] DR 6-101(A)(3) provides:

"A lawyer shall not:

"* * * * *

"(3) Neglect a legal matter entrusted to him."

plaintiff's claim against the accused's client. The Bar further alleged that the accused on July 26, 1983, received from his client the sum of $500 to effectuate the settlement, that the accused did not deposit the funds in a separate identifiable client's trust account until used for their intended purpose or returned to the client, and that the accused did not render an appropriate accounting to his client regarding those funds. The Bar further alleged that despite demand by Berne for payment of the amount of the settlement, the accused failed to pay; rather, it was alleged, the accused led Berne to believe that the settlement check was in the mail "on numerous occasions when he knew his representations to [Berne] were not true." The Bar alleged that Berne had not received the money as of October 16, 1984, almost 15 months after the agreement to settle and the payment to accused by his client of the $500. The Bar alleged that the accused used the $500 for his personal purposes without the consent of his client.

The Bar alleged that the conduct of which complaint was made in the second cause violated the following: DR 1-102(A)(4), DR 6-101(A)(3), DR 7-101(A)(2) and (3), DR 9-102(A) and DR 9-102(B)(3).[2]

In the third cause the Bar charged that the accused was retained by a creditor on a collection matter. The Bar alleged that the cause was settled, and the debtor paid the amount of the settlement into court. In August of 1983, this amount was allegedly paid to the accused. The Bar further alleged that the accused and the client had a disagreement as to how much of that sum was to be paid to the accused. The

---

[2] DR 1-102(A)(4) provides:

"A lawyer shall not:

"* * * * *

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

DR 7-101(A)(2) and (3) provide:

"A lawyer shall not intentionally:

"* * * * *

"(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105.

"(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102(B)."

Bar further alleged that the accused deposited the check in the checking account of a friend. The client and the accused, it is alleged, eventually decided to arbitrate the matter, and the arbitrator ordered the accused to pay to the client approximately one-half of the amount the accused had received from the settlement. The third cause alleged that the accused had still not paid that amount, about $600, to the client as of October 16, 1984. Rather, it is alleged, the accused used the money for his personal purposes without the consent of the client. The Bar further alleged that the accused had failed to hold the sum received in a client's trust account until the dispute was settled, had failed promptly to notify the client of the receipt of the money, had failed to maintain accurate records of the client's funds and had failed to render an appropriate accounting to the client when the client sought one. It was also alleged that the accused refused to comply with the client's demand to pay the money. The third cause charged violation of DR 1-102(A)(4), DR 9-102(A) and DR 9-102(B)(1), (3) and (4).[3]

By his tardy answer, the accused admitted substantially all of the allegations except violation of DR 1-102(A)(4), and denied that he had intentionally failed to seek the lawful

---

DR 9-102(A) provides:

"All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable trust accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein * * *."

DR 9-102(B)(3) provides:

"A lawyer shall:

"* * * * *

"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

[3] DR 9-102(B)(1) and (4) provide:

"A lawyer shall:

"(1) Promptly notify a client of the receipt of his funds, securities or other properties.

"* * * * *

"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

objectives of his client and intentionally prejudiced or damaged his client with respect to the second cause.

When the matter came on for hearing, the accused stipulated that the only issue to be tried was whether he violated DR 1-102(A)(4) when he converted to his own use his clients' funds as charged in the second and third causes. The accused contended that he did not intentionally convert the funds.

The accused submitted a written statement that was received in evidence, which stated:

> "Although being an alcoholic and having serious emotional problems do not excuse my failure to establish a client trust account or pay meticulous attention to the details of a client's legal matters, my recognition of my alcohol dependency and emotional problems, as well as the winding down of my active practice, certainly indicate that my actions on which the complaints were filed against me were not performed with malice or intentional deceit.

> "Once I had decided to dissolve my law partnership, as well as temporarily leave the practice of law, I made a conscious effort to place my clients and their files with competent attorneys who could represent them better than I could. The cases I kept, and notably the clients who filed complaints against me, were cases that had little or no monetary appeal to other practitioners and thus, I determined that I would have to continue to handle them. I believe that was a serious mistake on my part and that I should have simply resigned from each of the cases and turned the files over to the clients. I acknowledge that that was a mistake. Although I used poor judgment, the circumstances of my case should not go unheard. I was trying to wind down my law practice to allow me time to rehabilitate myself. Unfortunately, I stumbled at the end.

> "I intend to make restitution. I will also enter into an alcohol rehabilitation program which I personally intend to complete prior to my resumption of the practice of law.

> "Dated this 13th day of March, 1985."

The accused testified that when he received the $500 check mentioned in the second cause, he no longer had a client trust account because he was winding down his practice. He testified that he deposited the check in another bank account and took $500 from his own funds and placed that amount of cash

in his client's file, which was in the office of another attorney, where the accused was utilizing space while winding down his practice. He testified that he thought his client was about to take bankruptcy and that he feared to disburse the money because the accused thought he might be personally liable to the trustee in bankruptcy. He later spent the funds kept in the client's file for his own purposes.

With respect to the third cause, he testified that he no longer had a client trust account when he received the check from the settlement and that that was the reason he deposited the check in his friend's account. The accused was a "signatory" on that account, although he was not an owner of the account. He testified that he placed cash in the amount of that check in the client's file kept at the accused's home. Eventually he spent for his own purposes that entire amount.

In June, 1984, the Bar sent a representative to interview the accused concerning complaints by both clients involved in the second and third causes. The accused admitted before the Trial Panel that when the Bar's representative asked him where the money was, he had lied about its whereabouts and that he failed to take the cash and deliver it to the Bar's office as he had promised to do.

The Trial Panel found that the accused had violated every disciplinary rule as charged in the three causes contained in the Bar's complaint. The Trial Panel found mitigating circumstances as follows:

> "There are mitigating circumstances in this matter which caused the trial panel to believe that the Accused should be suspended from the practice of law rather than disbarred. The Accused recognized his alcohol dependency and that he suffered from emotional problem[s] and did undertake to transfer to other lawyers the legal matters he was handling for various clients. He kept three or four cases which, because they involved modest amounts, could not be easily transferred to other lawyers and it was while handling these cases that the wrongdoing by the Accused occurred which resulted in his clients losing less than $1,200."

Acting under BR 6.1 and 6.2, the Trial Panel decided that the accused should be suspended from the practice of law for a period of three years, but that the third year be stayed and the accused be placed on probation under specified terms and

conditions related to treatment for alcoholism, forbearance from use of alcohol, restitution to the clients and the acceptance of supervision from the Bar.

We are required to try the facts on the record made before the Trial Panel.[4] The accused's answer and the stipulation before the Trial Panel leave little to resolve with respect to facts. We shall accept the accused's testimony that for a time he kept the cash of each of the clients in their respective files.

In his brief in this court, with respect to the second cause of complaint, the accused states:

> "Petitioner [the accused] never arranged for the $500 payment of cash on behalf of his client and later spent the funds, apparently while under the influence of alcohol and while extremely destitute."

With respect to the third cause, the brief states:

> "Thereafter, Petitioner [the accused] appropriated the cash placed in [the client's] file for his personal use, again, apparently while under the influence of alcohol and extremely destitute."

We are puzzled by these statements in the brief. Before the Trial Panel, at the very end of the proceedings, the following occurred:

> "[Bar Counsel]: Following that up, it's my understanding that there's not being an allegation made here that Mr. Laury's alcohol dependency, if any, made it impossible for him to form the requisite intent.
>
> "Is that correct?
>
> "[Accused's Counsel]: I — that's not an allegation. That's not a fact. That's part of the explanation. That's, in other words, background explanation in mitigation of the circumstances.
>
> "It's not offered as a fact or anything else. It's something that we gave in good faith, under oath."

We understand that colloquy to mean that the accused was not asserting to the Trial Panel that he lacked capacity to

---

[4] We find the accused guilty of the charged violations of DR 6-101(A)(3), 9-102(A), and 9-102(B)(1), (3) and (4).

understand what he was doing when he spent his clients' funds.

The statements in the brief intimate something else. We have searched the record for any evidence that would support a contention that the accused lacked capacity to appreciate what he was doing when he spent the money. As he argues in his brief, he may well have been under the influence of alcohol, but that is not at all the same as being so intoxicated as not to know what one is doing. As members of this court, we see cases every day in which destitute persons under the influence of alcohol commit theft. Neither condition excuses the conduct.

The strongest evidence that the accused did not know what he was doing when he spent his clients' money is his statement that at one point he had taken the money out of the files and placed it in a drawer in his home and that he had thereafter moved his belongings to a different residence. He testified:

> "And right before that period of time, when I left, is when I appropriated the money or, apparently, appropriated the money. It's gone."

The seemingly intended implication is that he does not remember physically taking the money from the drawer and, therefore, could not have intentionally misappropriated the money. That may be so, but it is irrelevant.

The accused admits that he remembers that the Bar sent an investigator to inquire about the money. He admits that at that time he had the money. He concedes that he promised the investigator that he would forthwith transmit the money, in cash or a cashier's check, to the Bar for disbursement to his clients. He thereby conceded that his clients were entitled to immediate possession of their money; nevertheless, he kept the money, and it was some time later that the money disappeared in a manner he professes not to remember.

He misappropriated the money when he did not deliver it to the Bar for disbursement to his clients. He intentionally and knowingly failed to make that delivery. He remembers that failure. We are clearly convinced that the accused's conduct was a violation of DR 1-102(A)(4) with

respect to both the second and third causes as charged in the Bar's complaint.

The accused argues that he should not be disbarred because alcoholism is a disease and it is his illness from that disease that has caused his defalcations. On the other hand, the Bar asks that we lay down a hard and fast rule that intentional misappropriation of a client's funds will always result in disbarment.

The accused relies on cases in which we have not disbarred attorneys where alcoholism was involved in their misconduct. We shall examine each case cited by the accused.

In *In re Loew,* 296 Or 328, 676 P2d 294 (1984), we had a case in which, among other things, the lawyer was charged with failing to pay over to a client upon demand sums to which the client was entitled. This was technically a conversion, but the lawyer was not charged with violation of DR 1-102(A)(4). We did not disbar the lawyer.

In *In re Dan Dibble,* 257 Or 120, 478 P2d 384 (1970), the accused was not charged with any conduct relating to misuse of clients' funds.

In *In re James H. Lewelling,* 244 Or 282, 417 P2d 1019 (1966), the lawyer was accused of failing to pay his bills, failure to prosecute several civil causes to conclusion, interfering with police work while the lawyer was both drunk and a deputy district attorney, and withdrawing funds from his trust fund for clients for his own personal use, sometimes resulting in overdrafts on the account. This was a case in which disbarment did not follow upon misappropriation of clients' funds. We shall mention this case again anon.

*In re George M. Sennatt,* 211 Or 358, 315 P2d 557 (1957), presented a case where the lawyer accepted fees from clients to perform professional services but failed to make any effort to perform. This court inferred that his failure to perform was due not to lack of diligence but to an intention not to proceed on behalf of the clients. The court found that "during the time of Mr. Sennatt's dereliction of duty he was suffering under a severe nervous strain and had resorted to the excessive use of alcohol." 211 Or at 359. The charges against Sennatt were six in number, and all of them were for failing and neglecting to perform the services he had agreed to

perform and, in some cases, for failure to respond to his clients' inquiries. There were no charges of commingling or of conversion of his clients' funds to his own use.

In *In re John P. Ronchetto,* 202 Or 410, 270 P2d 683, 275 P2d 872 (1954), the lawyer was accused of having been drunk and disorderly on various occasions and of having issued checks when he did not have sufficient funds in his checking account for payment on presentment. The matter of the checks was submitted to the Grand Jury for Multnomah County, and a Not True Bill was returned. There was no charge by the Bar of commingling or of misappropriation of clients' funds.

The last case cited by the accused is *In re Holman,* 297 Or 36, 682 P2d 243 (1984), in which the lawyer did commingle and use for his own purposes clients' funds, but we did not disbar that lawyer. There, the lawyer was shown to be addicted to certain drugs, notably valium, and to the excessive use of alcohol. His defense to a charge of violating DR 1-102(A)(4) was that by reason of his addiction he did not know what he was doing was wrong. He presented the evidence of several medical witnesses that he lacked the cognition essential to realization of what he was doing. Essentially, the accused there contended that he did not understand that what he was doing was wrong, although he knew that he was writing the checks in question. We stated that the burden of proving intent to misappropriate funds was on the Bar and that the Bar's prima facie case of conversion was sufficient to permit an inference that the lawyer's misconduct was such that he was aware of the wrongfulness thereof. Taking into consideration the medical evidence adduced by the accused, however, we found that we could not say that it was highly probable that he did appreciate the wrongfulness of his conduct in converting his clients' funds.

There are three relatively late cases not cited by the accused involving conversion of funds.[5] One is *In re Warner W. Gregg,* 252 Or 174, 446 P2d 123, 448 P2d 547 (1968), in which the lawyer was accused of converting to his own use the

---

[5] There are several more cases in which lawyers found guilty of converting their clients' funds were not disbarred. They are older cases than that of *In re Warner W. Gregg,* 252 Or 174, 446 P2d 123, 448 P2d 547 (1968), and what we have to say in the text concerning *Gregg* applies to those cases.

funds of a club, of which he was treasurer. After first ordering disbarment, this court, on rehearing, ordered suspension. In *In re William J. Sundstrom,* 250 Or 404, 442 P2d 604 (1968), which was decided while *Gregg* was pending in this court, a lawyer commingled and converted his client's funds to his own use. He was suspended rather than being disbarred. In *In re Kenneth W. Stodd,* 279 Or 565, 568 P2d 665 (1977), the accused misappropriated the funds of a club, over which he had control as president of the club. Citing *Gregg* as being quite similar, we suspended, rather than disbarred, the lawyer.

Since the time of the *Gregg, Lewelling, Sundstrom* and *Stodd* decisions, we have spoken to misappropriation of clients' funds in no uncertain terms in *In re Pierson,* 280 Or 513, 571 P2d 907 (1977), in which we did disbar the lawyer. In that opinion at footnote 1, 280 Or 517-18, we intimated that we believed the sanction in *Gregg* and *Stodd* to be inadequate. We went on to state:

> "We hold that a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment."

280 Or at 518. Citations to cases earlier than *Pierson* for lenient treatment of misappropriation of funds by lawyers is no longer of any avail.

■ The Bar points out that since our decision in *Pierson* we have ordered disbarment for misappropriation of clients' funds in the following cases: *In re Kellner,* 297 Or 329, 683 P2d 89 (1984); *In re Thomas,* 294 Or 505, 659 P2d 960 (1983); *In re Robeson,* 293 Or 610, 652 P2d 336 (1982); *In re McCormick,* 281 Or 693, 576 P2d 371 (1978). The Bar urges that we make it plain that misappropriation of clients' funds will always result in disbarment. *In re Holman, supra,* teaches that the meaning of misappropriation is the key to whether disbarment will result. There, we at least implicitly held that where one by reason of want of cognitive capacity to appreciate the wrongfulness of his act uses his client's money for his own purposes, disbarment is not warranted. Essentially, our holding there was that DR 1-102(A)(4) is not violated in such circumstances.

The accused argues that automatic disbarment for converting a client's funds to one's own use is a "blind form of justice." As demonstrated by our decision in *Holman,* the

answer lies in whether the lawyer was aware of the wrongfulness of his conduct.

 If we accept the accused's own testimony as being true, he had his clients' funds on hand when he promised the Bar's investigator that he would forthwith deliver those funds to the Bar for disbursement to the rightful owners. As we noted in *Holman,* the Bar's case can be established by permissible inferences, and here we are clearly convinced that when the accused failed to make the delivery, he intended to continue his exercise of wrongful dominion over his clients' funds.[6] We find that the accused intentionally and knowingly thereby misappropriated those funds to his own use, and we conclude that his conduct was a violation of DR 1-102(A)(4).

It is ordered that the accused be disbarred and that the Oregon State Bar have judgment for its reasonable and necessary costs and disbursements.

---

[6] The effect of the adoption of the Oregon Evidence Code has not been argued or briefed. OEC 311(2) provides that a statute making a fact or group of facts prima facie evidence of another fact establishes a "presumption" within the meaning of the rule. The Commentary to OEC 311 states that presumptions may be created by the courts. OEC 308 provides that the opponent of a presumption has the burden to overcome the presumption. Although the Oregon Evidence Code applies to all courts, with specified exceptions, OEC 101(1), we do not have occasion here to determine its effect on the prima facie case that we identified in *In re Holman,* 297 Or 36, 682 P2d 243 (1984).