Argued January 25; decided February 28, 1898.

## EX PARTE KINDT.

[52 Pac. 187.]

DISBARMENT OF ATTORNEY FOR FORGERY*. — The offense of forging checks, letters, affidavits and signatures thereto, and using them to injure and defraud a client is such as to imperatively require the revocation of an attorney's license.

DEPOSITIONS — CROSS-EXAMINATION. — The right to meet witnesses face to face, and to cross-examine them, is waived by stipulating that the testimony of such persons may be taken by deposition, reserving only questions as to the relevancy, materiality and competency of the evidence.

Proceeding for disbarment by the State of Oregon, on relation of the grievance committee of the State Bar Association, against Charles E. Kindt, for unprofessional conduct. License revoked, and defendant disbarred.

For the petition there was an oral argument by *Messrs. Cicero M. Idleman*, attorney-general, and *Zera Snow*.

*Contra* there was an oral argument by *Chas. E. Kindt, in pro per.*, and *Henry Stanislawsky*.

MR. JUSTICE BEAN delivered the opinion.

This is a proceeding in the name of the state, upon the relation of the grievance committee of the State Bar Association, for the removal of Charles E. Kindt, an attorney of this court, for unprofessional conduct.

---

*NOTE. — The following cases and the notes appended to them give an extended review of the rights, powers and duties of courts in disbarment proceedings: *Fairfield County Bar* v. *Fessenden* (Conn.), 13 L. R. A. 767; *State ex rel.* v. *Finley* (Fla.), 18 L. R. A. 401; *Re Kirby* (S. Dak.), 39 L. R. A. 856.—REPORTER.

In brief, the charge in the information is that the defendant, while the attorney for the executors of the estate of Miles Davies, deceased, presented to his clients a false and fraudulent check and affidavit, for the purpose and with the design of inducing them to believe and as evidence that a certain note belonging to said estate, and executed by the defendant, had been paid. The facts are that in 1893 Miles Davies, the grandfather of the defendant, died in Washington County, leaving a will, wherein his sons Alfred and A. N. Davies are named as executors thereof. Among his assets was a promissory note on the defendant for the sum of $125 and interest. The testimony in behalf of the informants shows that some two or three months after the appointment of the executors the defendant, while acting as their attorney, claimed to them that the note against him had been paid to the testator by a check on a bank in Washington, D. C., and, being asked if he could produce the check as evidence of such payment, said he did not think he could, for the reason that the bank upon which it was drawn had failed or gone out of business, but he thought he could get an affidavit of its payment from the man who was cashier at the time. At a later date, while he and the two executors were in consultation in Judge Humphreys' office at Hillsboro, about matters pertaining to the estate, the defendant produced what purported to be a check drawn by himself on the Lincoln Banking Company of Washington, D. C., of date August 15, 1892, for $150, in favor of Miles Davies, and having thereon what purported to be the endorsement of the payee; and also exhibited what

purported to be an affidavit of James H. Fair, Jr., subscribed and sworn to before C. V. Lee, notary public for the District of Columbia, to the effect that on the fifteenth of August, 1892, and prior to that time, and up to and including the thirtieth day of December, 1892, the affiant was the cashier of the Lincoln Banking Company of Washington, D. C.; that he knew C. E. Kindt, who was a depositor in said bank, and had standing to his credit therein on August 15, 1892, the sum of $151.25; that on October 20, 1892, there was received at the bank, through the United States mail, a check dated at Hillsboro, Oregon, August 15, 1892, drawn on the bank by Kindt for the sum of $150 in favor of Miles Davies, and on the twenty-second of the month the bank duly remitted by mail to Mr. Davies the amount thereof in currency, and charged the same to Kindt's account; that the banking company went out of business on January 1, 1893, and that the check attached to the affidavit and made a part thereof "is the original check as received and paid by the bank."

This affidavit and check, after having been examined by the executors, were returned to Kindt, who took them to Portland, but, the executors being suspicious as to their genuineness, one of them, a few days later, asked for and again obtained possession of the papers for further examination, and submitted them to Judge Humphreys at Hillsboro, who compared the endorsement on the check with the genuine signature of Miles Davies, and, at the request of the executors, wrote to James H. Fair, Jr., Washington, inquiring about the matter. In due time he received through the mail what purported to be a letter from

Fair, acknowledging the receipt of his letter of in-
quiry, and saying that the affidavit to which he re-
ferred therein contained all the facts in possession of
the writer; that the check was received and paid by
the bank in the ordinary course of business, and the
reason the money was sent in currency must have
been because "a request of that kind accompanied the
check, as the invariable rule of the bank was never to
remit in that manner unless requested to do so." The
letter goes on to say that "It is not at all improbable
that the letter (containing the check) 'stuck' in the
hands of some mail clerk, as money in a letter is
easily detected," and "that the bank was merged in
another concern about a year ago, and the letter ac-
companying the check is no doubt destroyed," and
that "if Mr. Davies did not receive the money it was
not the fault of the bank, nor of Mr. Kindt, for whom
we have a high regard." The executors, being un-
willing to accept the showing made as sufficient evi-
dence that the note had been paid, caused copies of
the affidavit and check to be made, which copies are
in evidence, but the original papers were returned to
Kindt, at his request, and are not before us.

In addition to the affidavit and check, there are
also in evidence three letters purporting to have been
sent from Washington by Fair to the defendant. The
first one is dated May 1, 1893, and purports to be an
answer to a letter from Kindt relating to a check
which he gave to Miles Davies, in which it is said
that the banking company "went out of business and
was absorbed into another concern incorporated by
act of congress January 1 of this year," since which

time the writer had not been connected with it, but he would see if he could get access to the old books and obtain the information desired. The next is dated June 25, 1893, and purports to be an answer to a letter from Kindt asking for the original check, in which the writer says that he will make an effort to get it. The other one is dated July 15, 1893, and purports to acknowledge the receipt of a letter from Kindt of the 8th inst., enclosing an affidavit for Fair to verify before some notary public in Washington, in which the writer says: "I will draw one myself and have it acknowledged and sent to you with the original check, which I now have." All the letters purporting to be from Fair were on letter paper having printed thereon "Office of James H. Fair, jr., real estate and money broker, Washington, D. C."

Now the evidence shows, and about this there is no dispute, that the affidavit, check and letters referred to were actually in existence at the time indicated, and that there was not during the year 1892, nor at any other time, such a concern in Washington as "The Lincoln Banking Company," nor were there any such persons there as "James H. Fair, jr.," or "C. V. Lee," but the letters purporting to have been written by Fair to Humphreys and Kindt, the affidavit purporting to have been made by Fair and the check annexed thereto, together with the endorsement of Miles Davies thereon, were all and each of them false and fraudulent, and the notarial seal which made the impression attached to the affidavit purporting to be the seal of C. V. Lee, notary public, District of Columbia, was manufactured by a sealmaker in Portland. This

much the defendant himself admits, but he claims that the scheme was concocted by his clerk, Hoopengarner, and the executors for the purpose of wronging and injuring him, and says he never presented or exhibited the affidavit and check to the executors or knew of their existence until he received them through the mail in the fall of 1893, nor did he claim at any time that the note in question had been paid. He does say, however, that in 1892 he gave a check on the Lincoln National Bank of Washington, an admittedly existing concern, to his grandfather for $140, to be applied on his note, with the understanding that it was not to be presented for payment until certain sums due him from parties in Washington should be placed to his credit at the bank, and, no such payments having been made, the check was subsequently, in September, 1892, returned to him, having thereon at the time the endorsement of Miles Davies; that in the fall of 1893, during a conversation between himself and Alfred Davies concerning his note, he exhibited this check, not for the purpose of making any claim against the estate, or as evidence of the payment of his promissory note, but for some other purpose not disclosed by his testimony, and that a spirited controversy ensued between them as to the genuineness of the signature of Miles Davies on the back thereof, and that, on account of such dispute and for no other reason, he made an affidavit to the effect that the endorsement was genuine, and delivered the original check and affidavit to Mr. Davies. And he claims that it was this check and affidavit which were delivered to Davies instead of the affidavit of Fair and the

check on the Lincoln Banking Company annexed thereto, as testified to by Davies. He further says that Davies retained what he claims to be the genuine affidavit and check for about a week and then returned it to him by mail, and that at about the same time he received through the mail the original Fair affidavit and check, which was the first knowledge he had of their existence; that all these papers have disappeared from his office, and he thinks were stolen by his clerk, Hoopengarner.

But these statements are not only highly improbable and very unreasonable on their face, but they are in direct contradiction of the positive testimony of both of the executors of the estate, of Judge Humphreys, and of defendant's clerk and stenographer, Hoopengarner, as well as inconsistent with and contradictory of letters from the defendant himself to one of the executors. On November 13, 1893, a few days after he says he delivered what he claims to be the genuine affidavit and check to Alfred Davies, but which Davies swears were the Fair affidavit and check, the defendant wrote to him saying: "While in Hillsboro yesterday, I was informed that a rumor was floating around to the effect that I had acted in a dishonorable way in connection with money alleged to be due Grandpa Davies' estate from me. I am not able at this moment to say who originated this falsehood, although I have my own idea about it, but I have left its investigation in the hands of a competent person, and when it is traced back to its author, that person, whoever he may be, will apologize to me or else prove his accusation in open court. I do not

propose to sit idly by, for a single instant, and have my reputation and character attacked, without entering my vigorous protest. I was also informed, while in Hillsboro, that the paper which I gave you at my office on Friday last for your personal inspection has passed out of your hands into the possession of Judge Humphreys. If this is true, and I have every reason to believe it is, I want to give you notice now that the check and affidavit attached to it is my personal property, and if both of them are not back in my office and in my possession before the end of this week, I shall take proceedings to get them back. If you are in any way dissatisfied with matters, why in the name of God haven't you the courage to say so to my face and in my presence, and not beat the devil around the bush in a sneaking manner, and thus give an opportunity to some irresponsible ass to put in circulation a story calculated to injure my reputation. You know perfectly well that I am ready at all times and in every proper manner to answer for my conduct. If you want to write to any parties in Washington, why didn't you say so to me, when you saw me? I have no objection whatever to your writing to as many people there as you want to, but what I do most seriously object to is this underhand method of doing things, and of improperly putting before the public a matter which concerns nobody but yourself and me. I have no objection to your inspecting matters connected with the estate, but when it comes to passing these things around to the public, that is another and entirely different thing. The statements made in this letter will not be deviated from a single

inch. When I gave you the articles in question I did not suppose for a minute that in a few days that I should hear about them flying around the country.

Very respectfully,

"C. E. KINDT."

The next day Mr. Davies, in answer to this letter, explained that the reason he put the papers in Judge Humphreys' hands was that the signature on the back of the check might be compared with the latest signature of Miles Davies, which was then in Humphreys' possession, which he supposed he had a right to do, and he further said that if Kindt wanted to withdraw the papers referred to in his letter as a claim against the estate, he could do so, but if he wished to regard them as such they belonged to the executors, and asked that if he desired to withdraw them to please make a request in writing to that effect. On the next day Kindt wrote again, saying: "I have before me your note of the 14th inst. I thought I made plain in the note I sent you yesterday the reason I wanted the papers returned to me. I have no objection to your comparing signatures or writing to anyone for information which you may desire in regard to the matter; if I had had any such objection, I would not have handed you the papers in the first place. What makes me disgusted is to have you pass them around the neighborhood until some contemptible jackass gets them into his hands, and then goes around the streets telling the lie of which I heard about in Hillsboro. I do not accuse you of starting the story which I heard, but I do hold you indirectly responsible for it, because if you had kept the papers in your

possession and made the investigation yourself, the opportunity would not have been presented for some fool to exploit his wisdom. In answer to your question as to whether I want to withdraw my claim from the estate, which I suppose is another way of asking whether I want to pay the $150 over again, I have only this to say: That there would be just as much sense and propriety for me to ask you to pay to the estate double the amount which you owe it. Whenever you take a notion to do that, and whenever the other persons owing the estate agree to pay to the estate double what they owe it, then I will cheerfully pay my $150 over again. I am not so in love with any person, even with my relatives, as to pay them double the amount which I owe them. Until there is some rule to the effect that a man must pay his debts twice, I prefer to pay mine but once, which I have done in this case, which is all that is required of anyone, and which is all that will be required of me. If the papers were put in Humphreys' hands simply to compare the signatures, he has now had ample time in which to do that, and I therefore renew my notice to you to get them back into your possession, and bring them to my office the first time you come in the city, and at which time I will be ready to discuss with you anything in relation to the matter. It hardly seems necessary for me to point to you the difference between handing you a paper for your personal inspection and between handing you one for filing in an official capacity."

Now, these letters show, beyond question, that the affidavit and check submitted to Humphreys for exam-

ination were the identical papers delivered by Kindt
to Davies, and it is clearly shown by the testimony of
Humphreys that the only affidavit and check ever
shown to or examined by him was the Fair affidavit
and the check attached to it. And this leaves no
room for doubt as to where the truth lies upon the
question. These letters further show that Kindt was,
in fact, making the claim that his note had been paid,
and that Davies was investigating the genuineness of
the evidence submitted by him in that behalf, and it
was this fact which seems to have aroused his indig-
nation. He seems to have thought it presumptuous
in the executors to question the honesty of his mo-
tives, and evidently thought to silence them, and pre-
vent further inquiry into the matter, by putting on a
bold front. But the fact, as they believed, that their
father was unable to write at the time the endorse-
ment on the check was claimed to have been made,
caused the executors to hesitate, and in due time the
whole scheme was exposed.

It is true, while on the witness stand before the
referee, Kindt equivocated, and, in a measure, denied
that he wrote either of the letters in question. But
in a statement made by him to the grievance commit-
tee of the Bar Association, at the time the charges
were filed with that committee and in explanation of
such charges, he admitted that he wrote the letter of
November 15, 1893, and these two letters are so in-
separably connected that it is impossible for him to
have written one without the other, or at least with-
out knowledge of the contents of the other. And,
besides, they were both addressed to and received by

Mr. Davies, referred to matters connected with the estate known only to Davies and the defendant, according to his own testimony, and the second one is in answer to a letter written by Davies to Kindt, and it is impossible to believe, under the circumstances, that they could have been written by any person other than the defendant, or under his direction. But, in addition to all this, when we compare the signature appended to these two letters with the admittedly genuine signatures of Kindt, in other parts of the record, it is hardly possible to doubt their genuineness. These letters, of themselves, afford sufficient corroboration of the testimony for the informants as to satisfy us of the defendant's guilt.

But, in addition to this, we have the testimony of Hoopengarner, who was the stenographer and typewriter of the defendant at the time these transactions took place, and up to about the thirty-first of March, 1894. He testifies that the Fair letters and affidavit were dictated to him by the defendant at his office in Portland, and were by the witness transcribed, and that, at defendant's request, he (witness) signed the name "James H. Fair, jr.," to them; that defendant explained to him at the time that the papers were being prepared to avoid the payment of a note for $150 which the executors of the estate of Miles Davies, deceased, had against him; and when the witness demurred to being a party to such a scheme, Kindt said that the matter would never come up, and that if it did the witness could not be held liable therefor, as he was merely a clerk. The witness further says that the first letter purporting to be from Fair to Kindt

was designed to indicate that the Lincoln Banking Company was absorbed into another concern, and so evade any trace of the check, and to baffle any inquiry as to the existence of such a bank; the second one, to show that an effort was being made to recover the check as proof of the remittance; and the third, to show that the check had been found, and that Fair was cashier of the bank. The letter to Humphreys was designed to show that Kindt had an account with the bank, and that the money on the check had been sent in currency to Miles Davies, and possibly intercepted in the mails before reaching him. The witness further testifies that the seal used on the affidavit, purporting to be that of C. V. Lee, a notary public of the District of Columbia, was in fact manufactured by a sealmaker in Portland, at Kindt's request, and by him impressed upon the affidavit. This seal was subsequently obtained by one of the executors, and is in evidence in this case. The record is silent as to how Kindt came into possession of the letter addressed by Humphreys to Fair, at Washington, D. C., but it could readily have been obtained either by some person acting for him there, or by means of an order directing that mail addressed to Fair be forwarded to Portland in his care.

It is sought to discredit the testimony of Hoopengarner by showing that he and defendant had some difficulty in the spring of 1894, in consequence of which an unfriendly feeling exists between them, and that his reputation for truth and veracity is not good. It is true that they did have some misunderstanding about the time stated, concerning the payment of his

salary, yet the undisputed testimony shows that the false papers were made and in existence long before that time, and while the relationship between Hoopengarner and defendant was admittedly most friendly and confidential, and when there was no motive whatever, so far as this record shows, to induce him to engage with the executors in concocting a scheme to wrong or injure his employer. And, besides, it does not appear that he possessed the necessary information to have done so if he desired. The testimony in the record tending to impeach Hoopengarner, considered in connection with the fact that he was willing to and did engage in and become a party to the fraudulent scheme testified to by him, is sufficient to cause his testimony to be viewed with suspicion; but all the material facts testified to by him are corroborated and borne out by other and independent testimony. But if it be conceded that he is wholly unworthy of belief, and that his testimony is to be stricken out of the case altogether, enough still remains, as we have already shown, to support the charge made.

The contention that the false papers were made or caused to be made by the executors of the estate, for the purpose of injuring and wronging the defendant, is hardly worthy of serious consideration. There is not the slightest evidence in the record to indicate that they had any motive or design or desire to wrong or injure the defendant in any way. The claim that it was because of some advice he gave one of the executors soon after his appointment is clearly without merit, for it appears that he continued thereafter to act as their attorney, and there was no estrangement

whatever between him and the executors on account of such advice. And the claim that it was because of some foreclosure proceeding brought by the defendant against one of the executors in the fall of 1894 is even more untenable, for the testimony shows, and the defendant himself admits, that all the false papers, affidavits and checks referred to were prepared and in existence a year before that, time. And, besides, if the executors had been parties to such a transaction, they certainly were not foolish enough to have delivered the original affidavit and check, upon which the success of their scheme very largely depended, to the defendant, to be by him disposed of as he might deem proper. It may be, and probably is, the fact that had it not been for what Hoopengarner conceived to be the wrongful treatment of himself by the defendant, and the subsequent conduct of the defendant toward the executors, the scheme would never have been unearthed or the defendant prosecuted. It appears that soon after falling out with defendant, Hoopengarner disclosed the whole matter to one of the executors, and gave him the information which led to the production of the evidence by which the defendant's guilt is shown.

It was urged at the argument, with apparent candor, that the fact that the defendant prepared the inventory of his grandfather's estate, and listed among the assets the promissory note against himself, and made no claim that it had been paid, is a very strong circumstance in his favor. But it is a sufficient answer to this position to say that he probably had not at that time conceived the idea of attempting to

evade its payment by means of false and forged testimony. And, again, much stress was laid upon the fact that when the defendant was sued by the executors on this note, in August, 1894, he made or offered no defense on the ground that it had been paid. But it can hardly be believed that this argument is made with seriousness, when it is remembered that the falsity of his scheme had become apparent, and the evidence thereof was in possession of the executors long before the action was begun, and he knew, therefore, that it would be useless to attempt such a defense.

The testimony of Hoopengarner, already referred to, and of John R. Young, clerk of the Supreme Court of the District of Columbia, to the effect that there was no notary public in such district during the year 1893 as C. V. Lee, and also the testimony of Jesse B. Wilson, president of the Lincoln National Bank, to the effect that there was no such banking concern in Washington as the "Lincoln Banking Company," and no such party known to the witness as "James H. Fair, jr.," was all taken by depositions, and objection is made to its consideration on the ground that this proceeding is *quasi* criminal in its character, and that the defendant is entitled to meet the witnesses face to face, and cross-examine them. But the depositions were each and all taken in pursuance of a stipulation of the parties expressly waiving all objections to the manner of taking the same, reserving only questions as to the relevancy, materiality and competency of the testimony, and this stipulation is

32 Or.—32.

clearly a waiver by defendant of the right claimed by him, if the objection would otherwise be sound.

We have given the facts as disclosed by the testimony, and the several contentions of the defendant, a most painstaking and careful consideration, because we recognize that the office of attorney is ordinarily valuable to its possessor, and that to deprive him of it for unprofessional conduct, not only leaves him with a blighted reputation, but in many cases without the means of earning a livelihood for himself and those dependent upon him, and, therefore, an order of removal should be made only upon the clear and satisfactory proof of guilt. But, notwithstanding the consequences, grave as they are, which flow from such an order, the court would be derelict in its duty should it hesitate to remove an attorney whose professional unworthiness is shown by legal and competent testimony. The order for his admission is, in effect, a certificate by the court that he has not only the necessary legal learning, but that his honesty and integrity are such as to be a pledge to those dealing with him professionally that he will act with honesty and fidelity to the interests entrusted to his care; and when he is shown to be unworthy in this respect, it would be a scandal to the court, unjust to the community, and a grave wrong to the profession, to continue him on the roll, and thus hold him out to the world as a member of the bar worthy of the confidence of the community. It is unnecessary to comment upon the conduct of the defendant as disclosed by this record. It unmistakably appears that while attorney for the estate of his grandfather, and therefore charged with the duty of

protecting its interests, in gross violation thereof he designedly and deliberately concocted and attempted to carry out a scheme to rob and defraud his client by means of false and forged evidence. That such a person is unworthy to be a member of the bar goes. without saying. Justice to the court, protection to the public and the honor of the profession, alike inexorably demand that he be summarily removed, and his license revoked, and it is so ordered.

ORDER OF DISBARMENT.