Case no. SC S32005 argued and submitted December 3, 1985, case no. SC S32891
argued and submitted October 7, 1986, accused disbarred March 24, 1987

In re Complaint as to the Conduct of

# JOHN W. EADS, JR.,
*Accused.*

## (OSB 83-96, 83-112; SC S32005)
734 P2d 340

Stuart E. Foster, Medford, argued the cause for the accused. With him on the brief and petition was Foster & Purdy, Medford.

Donald Crane, Klamath Falls, argued the cause for the Oregon State Bar. Richard B. Rambo, Klamath Falls filed the answering brief for the Oregon State Bar.

In re Complaint as to the Conduct of

JOHN W. EADS, JR.,
*Accused.*

(OSB 84-81, 85-68; SC S32891)

734 P2d 340

Stuart E. Foster, Medford, argued the cause for the accused. With him on the petition, brief and reply brief was Foster & Purdy, Medford.

Susan D. Isaacs, Assistant General Counsel, Portland, argued the cause for the Oregon State Bar.

PER CURIAM

## PER CURIAM

This matter involves two separate lawyer disciplinary proceedings instituted by the Oregon State Bar against the accused, John W. Eads, Jr. The first proceeding was instituted by the Bar in May 1984 (Eads II)[1] and argued in this court on December 3, 1985. At argument on Eads II, the court was informed that additional charges were being investigated involving the accused. Thereafter, when the opinion of the trial panel in the more recent case (Eads III) was filed with the court, the court proposed withholding decision on Eads II until Eads III was argued and submitted. Neither the accused nor the Bar objected. The last proceeding was initiated by the Bar on December 9, 1985, and argued in this court on October 7, 1986.

## EADS II

The accused was charged in three causes of complaint with nine violations of the Code of Professional Responsibility (Disciplinary Rules). The accused admitted, and the trial panel found, that he had committed eight of those violations. The accused did not admit one violation and the trial panel reached no conclusion thereon.

### FIRST CAUSE:   THE JAMES MATTER

The first cause of complaint arose out of the accused's association with a Mr. and Mrs. James. The Jameses retained the accused to probate the estate of their adopted son. Before probate could occur, the accused was required to close an existing conservatorship and transfer its funds to the probate estate. It took the accused nine months to complete this step. During that nine months, the accused failed to keep appointments with the Jameses and failed to return telephone calls from the bank handling the conservatorship.

After November 1981, when the conservatorship was closed and the assets transferred to the probate estate, only the payment of inheritance, estate and final fiduciary taxes was required to close the probate estate. The accused failed to

---

[1] An earlier disciplinary proceeding (Eads I) against the accused on an unrelated claim of unethical conduct, alleged to have occurred between September 1979 and December 1981, was resolved in favor of the accused. *In re Eads,* 299 Or 33, 698 P2d 486 (1985).

file the proper tax returns and, in early 1982, the probate estate was assessed penalties and interest. Throughout the remainder of 1982 and the first half of 1983, the accused led the Jameses to believe that he had filed the proper tax returns and was awaiting the tax releases necessary to finish closing the probate estate. In reality, the returns had not been filed and the checks written by the Jameses to pay the taxes remained in a file in the accused's office. Finally, in mid-1983, the Jameses hired a new lawyer.

In answer to the Bar's complaint, the accused admitted, among other things, that only the payment of inheritance, estate and final fiduciary taxes were required to close the probate estate, that he promised his clients that he would file the tax returns immediately, that he failed to do so, that he had told the clients that the tax returns had been filed and that he had not done so.

The Bar charged the accused with four violations of the Code of Professional Responsibility:

DR 1-102(A)(4) provided:[2]

"A lawyer shall not:

"Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

DR 6-101(A)(3) provided:[3]

"A lawyer shall not:

"Neglect a legal matter entrusted to him."

DR 7-101(A)(2) provided:[4]

"A lawyer shall not intentionally:

"Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105."

---

[2] Subsequent to the conduct of the accused and the filing of the complaint by the Bar, this disciplinary rule was amended and now is numbered DR 1-102(A)(3), which provides: "It is professional misconduct for a lawyer to: * * * Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[3] This disciplinary rule also was amended (in an immaterial particular) and now is numbered DR 6-101(B).

[4] This disciplinary rule also was amended in an immaterial particular.

DR 7-101(A)(3) provided:[5]

"A lawyer shall not intentionally:

"Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102(B)."

The accused admitted, and the trial panel found, that the violations had occurred.

## SECOND CAUSE: THE SCHEPPLER MATTER

In November 1982, the accused agreed to assist a Washington lawyer, Gregory L. Lutcher, in the registration and collection of a Washington judgment involving a Medford, Oregon, debtor. Mrs. Scheppler, the Washington creditor, forwarded a $150 "retainer" fee to the accused, through Mr. Lutcher.

Between November 1982 and May 1983, the accused made no effort to communicate with either Mrs. Scheppler or Mr. Lutcher. He also neglected to return Mr. Lutcher's telephone calls. In May 1983, Mr. Lutcher sent a letter advising the accused that, if he were unable to assist Mrs. Scheppler, he should notify Mr. Lutcher so that new counsel could be retained. The letter also requested an accounting of the $150. When the accused failed to respond, Mr. Lutcher sent a second letter attaching a copy of a letter of inquiry from Mrs. Scheppler. Mrs. Scheppler asked that the $150 be returned so that she could hire other counsel. Again, the accused failed to respond. In July 1983, Mr. Lutcher sent a final letter giving the accused 10 days to respond. When there was no response, Mr. Lutcher notified the Bar.

The accused was charged with four violations of the Code of Professional Responsibility: DR 6-101(A)(3), *supra;* DR 7-101(A)(2), *supra;* and DR 9-102(B)(3) and (B)(4), which provided:[6]

"A lawyer shall:

"Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his

---

[5] This disciplinary rule also was amended in an immaterial particular.

[6] This disciplinary rule also was amended in an immaterial particular.

client regarding them.

> "Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

The accused admitted, and the trial panel found, that the first three violations had occurred.

The accused does not admit violation of DR 9-102(B)(4); he argues that he is entitled to the $150 payment made by Mrs. Scheppler. He testified that his hourly rate was $75 and that he spent two hours driving to Grants Pass to pick up the file and reviewing the procedure for registration of a foreign judgment. He admits that he never communicated with the judgment debtor or registered the foreign judgment.

On *de novo* review, we are unable to determine from the record whether the understanding in respect of the fee between the accused and Mrs. Scheppler (through Mr. Lutcher) was a true retainer fee or an advance in contemplation of future services. For a discussion, *see* Oregon State Bar Ethics Opinion No. 205 (1972), withdrawn by Board of Governors (1972), and No. 251 (1973). In his testimony, the accused acknowledged: "I can't honestly, I can't say that the fee was earned." Nevertheless, if the understanding called for a retainer fee, the failure of the accused to perform sufficient work for the client would not necessarily result in an ethical violation upon the failure to return the fee. We are unable to find by clear and convincing evidence that the accused violated DR 9-102(B)(4).

THIRD CAUSE:   FAILURE TO RESPOND TO THE BAR

The third cause of complaint arose out of the Scheppler matter. When the accused failed to respond to Mr. Lutcher's correspondence, Mr. Lutcher filed a complaint with the Bar. The accused then failed to respond to a letter from the General Counsel's office of the Bar and also a subsequent letter from the Local Professional Responsibility Committee. The accused was charged with violating DR 1-103(C), which, in 1984, at the time the alleged conduct took place involving this charge, provided:[7]

---

[7] This disciplinary rule also was amended in immaterial particulars.

"A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of the general counsel, the local professional responsibility committees, the state professional responsibility board, and the board of governors as requested, subject only to the exercise of any applicable right or privilege."

The accused admitted, and the trial panel found, that this violation had occurred.

As a result of the foregoing findings and conclusions, the trial panel recommended a stayed, one-year suspension, subject to compliance by the accused with a structured rehabilitation program, and probation for three years.

## EADS III

The accused was charged in seven causes of complaint with acts of escalating gravity. The complaint alleges acts of neglect, delay and misrepresentation in the probate of the estate of Iris C. Burton. The accused is further charged with failing to cooperate with the Bar's investigation and lying to the Bar about the disposition of a client's funds. Finally, the accused is alleged to have misappropriated $50,000 of a client's money, misrepresented the status of an appeal, commingled client funds with his own and failed to account for the client's money. The accused disputes the charges of failing to turn over accounts to a client, engaging in illegal conduct involving moral turpitude, and engaging in conduct involving misrepresentation.

## THE BURTON ESTATE

The first three causes of complaint arose out of the handling of a probate estate by the accused. The personal representative of the estate hired the accused to represent her for the probating of the estate. The probate proceedings were initiated by the accused on February 22, 1981.

The trial panel found that the accused neglected a legal duty in failing to file timely the inventory (even after two notices and a show cause order from the court), failing to file timely a document with the court, failing to deposit incoming funds of the estate for over six months (with a resulting loss of

money to the estate), and failing to file timely the fiduciary income tax returns (resulting in assessed penalties and interest to the estate),[8] thereby violating DR 6-101(A)(3). The trial panel found the accused not guilty of a violation of DR 7-101(A)(2)[9] under the foregoing conduct.

The trial panel found that, over an 18-month period, the accused lied to the beneficiaries (or their respective lawyers) about the status of fiduciary income tax returns, releases, and whether taxes were due. The accused, by trial stipulations, admitted that some of the statements were false and that he knew they were false when he made them. The trial panel concluded that the accused violated DR 1-102(A)(4).[10]

By trial stipulation, the accused admitted that he failed to respond fully and truthfully to inquiries from representatives of the Bar. The trial panel concluded that the accused violated DR 1-103(C), as quoted above.

## THE RICHARDS MATTER

The final four causes of complaint involve the dealings of the accused with Dr. Richards, a client of the accused against whom a civil judgment had been rendered.

Evidence before the trial panel discloses that the accused filed a notice of appeal in behalf of his client. Dr.

---

[8] DR 6-101(A)(3) provided:

"A lawyer shall not:

"Neglect a legal matter entrusted to him."

This disciplinary rule has been amended (in an immaterial particular) and now is renumbered DR 6-101(B).

[9] DR 7-101(A)(2) provided:

"A lawyer shall not intentionally:

"Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105."

This disciplinary rule also has been amended in an immaterial particular.

[10] DR 1-102(A)(4) provided:

"A lawyer shall not:

"Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

*See* n 2.

Richards forwarded to the accused $50,000 for a supersedeas bond to forestall execution of judgment pending appeal. The accused did not file the bond, though he told Dr. Richards that he had. Instead, the accused withdrew $19,500 from Dr. Richards' trust account and converted it to his own use. The bond was never filed and, after two notices to the accused, the Court of Appeals allowed the opponent's motion to dismiss the appeal.

The money was withdrawn in three increments during November and December 1983. In each case, the accused wrote a check on Dr. Richards' account, signed it and deposited it into his general account. The first withdrawal, $7,000, went to pay two obligations of the accused. The second withdrawal, for $10,000, cured a default on the accused's house. The third withdrawal was for $2,500, but the accused does not remember how he used it. In each case the accused stated that he was aware that he was taking Dr. Richards' money and that it did not belong to him. In the fall of 1984, the accused returned $32,000 to Dr. Richards. A balance of $18,000 apparently still is owing.

As a result of the foregoing conduct, the Bar charged the accused, and the trial panel found him guilty of violating the following disciplinary rules:

DR 1-102(A)(3), which provided:[11]

"A lawyer shall not:

"Engage in illegal conduct involving moral turpitude."

DR 1-102(A)(4), two counts, which provided:[12]

"A lawyer shall not:

"Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

---

[11] Subsequent to the conduct of the accused and the filing of the complaint by the Bar, this disciplinary rule was amended and now is numbered DR 1-102(A)(2), which provides: "It is professional misconduct for a lawyer to: * * * Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law."

[12] *See* n 2.

DR 9-102(A), which provided:[13]

> "All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows;"

DR 9-102(B)(3) and (4), which provided:[14]

> "A lawyer shall:
>
>> "Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
>>
>> "Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

As in the previous cause of complaint, the accused also admitted violation of DR 1-103(C), as quoted above.

On these charges, two members of the trial panel recommended disbarment. The third member filed a dissenting opinion wherein he recommended a stayed suspension of three years with three years probation under certain specified conditions.

## RESOLUTION

■ The accused was addicted to alcohol, marijuana and cocaine during the period of the acts charged. The accused places his drug dependency in issue in two discrete ways: its effect on culpability (Eads III) and its effect on the appropriate sanction (Eads II and III). He asserts that his addiction precluded him from appreciating the wrongfulness of his acts; he therefore did not have the intent required to find him guilty of misappropriation and misrepresentation. Alternatively, the accused asks this court to impose a sanction with primary

---

[13] This disciplinary rule was amended (in immaterial particulars) and now is numbered DR 9-101(A).

[14] These disciplinary rules were amended (in immaterial particulars) and now are numbered DR 9-101(B)(3) and (4).

emphasis on his rehabilitation. The accused argues that disbarment, as recommended by the Bar, is too severe a sanction in light of his rehabilitation from addiction since the Bar filed formal charges.[15]

## CULPABILITY

Culpability, the intent with which an act is done, is an element in some but not all disciplinary rule violations. At least two of the disputed charges in Eads III contain as an element the culpable commission of certain acts. DR 1-102(A)(3) and (4) provide that a lawyer shall not "[e]ngage in illegal conduct involving moral turpitude," or "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

The accused asserts that "[a]s a result of his serious chronic addiction to chemicals, [he] did not have the cognitive capability to appreciate the wrongfulness of his acts." The accused asserts that this case resembles *In re Holman,* 297 Or 36, 682 P2d 243 (1984), and should be resolved in the same way.

*In re Holman, supra,* involved a charge, among others, of withdrawing $42,000 from the lawyer's "office client trust account" for his own personal use. This court found that the intent required for the misappropriation charge had not been proved by clear and convincing evidence. The accused presented evidence that his acts of misappropriation and commingling were the result of mental impairment by reason of prescription drug addiction such that the Bar's *prima facie* showing of intent was in question. The evidence showed memory lapses and impairment of cognitive function at the time the accused made the withdrawals, indicating that he was unaware at the time of his acts that the withdrawals were improper.

The criminal code addresses intoxication and addiction as it relates to culpability. ORS 161.125(1) provides:

> "The use of drugs or controlled substances, dependence on drugs or controlled substances or voluntary intoxication shall

---

[15] The accused, in both proceedings, offered substantial evidence that, since mid-December 1984, he has embarked upon a rehabilitation program. Through the date of the second hearing he has been drug free.

not, as such, constitute a defense to a criminal charge, but in any prosecution for an offense, evidence that the defendant used drugs or controlled substances, or was dependent on drugs or controlled substances, or was intoxicated may be offered by the defendant whenever it is relevant to negative an element of the crime charged."

*Holman* in effect incorporated this standard when it acknowledged that addiction could be used to negative the element of intent.

*Holman* contrasted the evidence in *In re Warner W. Gregg,* 252 Or 174, 446 P2d 123, 448 P2d 547 (1968), where the court found the accused "committed the defalcations because of his addiction to alcohol. However, he knew what he was doing when he cashed at least some of the checks and before the association officials questioned him he was aware that he had committed defalcations." 252 Or at 177. *Gregg* found intentional misappropriation despite the accused's defense of alcohol addiction.[16]

This distinction is pertinent to the present case. The immediate question here is whether the accused offered evidence that would negative the Bar's *prima facie* case of intentional misappropriation. We find that he has not.

With regard to the misappropriation claim, the trial panel found that the accused, "in 3 transactions, withdrew a total of $19,500 of these trust funds from his trust account, deposited them in his own office account and used the money for Accused's own purposes when Accused knew that he was not entitled to so use those funds." The evidence bears this out. The accused acted with knowledge of the impropriety of his conduct. We find that the misappropriation was intentional.

## MITIGATION

The accused suggests that cases involving drug or alcohol addiction require special treatment; a *per se* rule of disbarment, he asserts, will have a detrimental effect on lawyers who should seek treatment for addiction. He argues that

---

[16] On rehearing, the sanction of disbarment was reduced to a three-year suspension. We have no explanation for this deviation from the settled treatment of knowing misappropriation of client funds. *In re Warner W. Gregg,* 252 Or 174, 446 P2d 123, 448 P2d 547 (1968). The sanction in this case is discussed *infra* at 17.

this court should fashion a sanction that will promote the rehabilitation of lawyers facing discipline, such as the accused, and give chemically dependent lawyers an incentive to seek help before their clients are damaged.

The accused presents the following standard by which to impose a sanction less severe than disbarment: The court must find that the accused (1) was addicted to one or more substances; (2) but for the addiction the accused is a competent practitioner; (3) but for the addiction the accused would not have committed the acts that gave rise to the disciplinary proceeding; and (4) the accused has commenced an effective rehabilitation program and is abstaining from the addictive substance(s).[17]

As the accused presents it, we understand this test to encompass more than a showing of unawareness of wrongdoing at the time of the act. The accused presented the opinion of a psychologist to the effect that the accused would not have acted as he did were he not dependent on drugs. This may be true. An addiction can at some level be the cause of many misdeeds. But we find the conclusion too attenuated.

This court faced a similar, if less explicit, plea in *In re Laury,* 300 Or 65, 706 P2d 935 (1985), in which a lawyer charged with misappropriation of client funds argued that his alcoholism led to his misconduct. He asserted that the court should impose a reduced sanction with consideration of the facts that alcoholism is a treatable illness and the accused was prepared to rehabilitate himself. *Laury* analyzed a number of past decisions of this court involving misappropriation and defenses of alcoholism or mental illness, including cases

---

[17] The accused's suggested test is similar to one developed by the Minnesota Supreme Court in *In re Johnson,* 322 NW2d 616 (Minn 1982). In that case, a lawyer guilty of misappropriation received a reduced sanction of two-years probation with conditions because of his alcoholism. The court posited a five-part test for an addiction defense, requiring proof:

"1. That the accused attorney is affected by alcoholism. 2. That the alcoholism caused the misconduct. 3. That the accused attorney is recovering from alcoholism and from any other disorders which caused or contributed to the misconduct. 4. That the recovery has arrested the misconduct and the misconduct is not apt to reoccur [sic]. 5. That the accused attorney must establish these criteria by clear and convincing evidence." 322 NW2d at 618.

For an analysis of this test and how it has been applied in Minnesota *see* Note, *The Disability Defense: How It Serves to Mitigate Charges of Professional Misconduct by Attorneys,* 12 Wm Mitchell L Rev 119 (1985).

imposing suspensions rather than disbarments. With regard to the latter cases, *Laury* stated:

> "Since the time of the [*In re Warner W.*] *Gregg*, [252 Or 174, 446 P2d 123, 448 P2d 547 (1968)], [*In re James H.*] *Lewelling*, [244 Or 282, 417 P2d 1019 (1966)], [*In re William J.*] *Sundstrom*, [250 Or 404, 442 P2d 604 (1968)] and [*In re Kenneth W.*] *Stodd*, [279 Or 565, 568 P2d 665 (1977)] decisions, we have spoken to misappropriation of clients' funds in no uncertain terms in *In re Pierson*, 280 Or 513, 571 P2d 907 (1977), in which we did disbar the lawyer. * * *" 300 Or at 76.

In *In re Pierson*, 280 Or 513, 571 P2d 907 (1977), we stated: "We hold that a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment." 280 Or at 518.[18]

Between *Pierson* and *Laury* lies a sequence of cases, broken only by *In re Holman, supra,* in which misappropriation of client's funds—even a single conversion—resulted in disbarment. *See In re Kellner*, 297 Or 329, 331, 683 P2d 89 (1984) (conversion of client's funds; court cites to *Pierson* "in which a single conversion by a lawyer to his own use of his clients' funds resulted in permanent disbarment"); *In re Thomas*, 294 Or 505, 527, 659 P2d 960 (1983) (misappropriation with no alcohol mitigation); *In re Robeson*, 293 Or 610, 632, 652 P2d 336 (1982) (lawyer found guilty of misappropriation, among other offenses; "The finding of guilt on the first cause alone [misappropriation] would warrant permanent disbarment"); *In re McCormick*, 281 Or 693, 697-98, 576 P2d 371 (1978) (lawyer disbarred for conversion of client funds to own use; excuse of alcohol and marital problems held "insufficient as a basis for the imposition of any lesser penalty than is usual in such cases"). As *Laury* makes clear: "Citations to cases earlier than *Pierson* for lenient treatment of misappropriation of funds by lawyers is no longer of any avail." 300 Or at 76.

With few exceptions, this court had, prior to *Pierson*,

---

[18] The term "permanent" disbarment is no longer accurate, if it ever was. Oregon State Bar Rule of Procedure 6.1(d), promulgated pursuant to the Oregon State Bar Board of Governors' statutory rulemaking authority, ORS 9.542, suggests that reinstatement after disbarment is possible. It provides, in part, that a "disbarred attorney may not apply for reinstatement until five years has elapsed from the effective date of his or her disbarment." This court must approve rules promulgated by the Bar. ORS 9.005(6), 9.542. Presumably, our authority to disbar is limited by the opportunity for reinstatement provided in the rule.

disbarred lawyers guilty of misappropriation of clients' funds. *See In re Bach,* 273 Or 24, 539 P2d 1075 (1975); *In re Dugan,* 272 Or 708, 538 P2d 938 (1975); *In re Celia L. Gavin,* 230 Or 187, 369 P2d 133 (1962); *In re Chester R. Sloniger,* 224 Or 276, 355 P2d 975 (1960); *In re Hermann,* 165 Or 59, 105 P2d 512 (1940); *In re McGowan,* 161 Or 393, 89 P2d 598 (1939); *State ex rel Multnomah Bar Association v. Tarpley,* 122 Or 479, 259 P 783 (1927); *State ex rel McCourt v. Garland,* 77 Or 92, 150 P 289 (1915); *State ex rel McCourt v. Smith,* 73 Or 96, 144 P 424 (1914); *Ex parte Kindt,* 32 Or 474, 52 P 187 (1898).

The exceptions can be placed in two categories: Cases in which the accused raised a defense that some disability negated the requisite intent, *In re Holman, supra; In re Albright,* 274 Or 815, 549 P2d 527 (1976);[19] and cases in which we have treated misappropriation with leniency, with or without a disability defense, because there were "grounds to hope for rehabilitation." *In re Kenneth W. Stodd,* 279 Or 565, 568 P2d 665 (1977); *In re Warner W. Gregg, supra; In re William J. Sundstrom,* 250 Or 404, 442 P2d 604 (1968); *In re James H. Lewelling,* 244 Or 282, 417 P2d 1019 (1966). *See also In re George M. Sennatt,* 211 Or 358, 315 P2d 557 (1957). The latter category was disavowed in *In re Laury, supra.*

The accused places particular emphasis on his rehabilitation. The evidence is undisputed that the accused has avoided alcohol and other addictive drugs since December 1984. He continues to attend Alcoholics Anonymous meetings regularly and to see a psychologist. He testified that he intends to repay Dr. Richards in full.

We have taken emotional, mental, physical and addictive disabilities and subsequent rehabilitation into account in a number of cases involving offenses less serious than the intentional misconduct at issue here. As recently as *In re Germundson,* 301 Or 656, 663, 724 P2d 793 (1986), we wrote:

"* * * In disciplinary cases, we distinguish [substance abuse's]

---

[19] In *In re Albright,* 274 Or 815, 549 P2d 527 (1976), the accused was found guilty of neglect, deceit and misuse of client trust funds. He was reprimanded and placed on probation for five years. At the time of the incident, the lawyer suffered from undisclosed physical problems that affected his judgment. We stated: "The neglect and subsequent deception were not a result of calculated or willful wrongdoing." 274 Or at 819-20.

role in assessing culpability from its significance in determining what is required to protect the public against future misconduct. Culpability under the disciplinary rules requires different mental elements, which may range from intent through knowledge and negligence to strict liability, and it is possible that a lawyer's innocent dependency on some drug without his own knowledge may incapacitate him from the required degree of mental judgment.* * *"

We also said, with reference to the American Bar Association's suggested standards on sanctions, that "the kind of impairment caused by alcoholism can (not necessarily will) mitigate discipline though it is no defense to the disciplinary charge." 301 Or at 664.[20]

*Germundson* was preceded by a long line of cases reflecting the same policy. Lawyers charged with neglect of legal duties brought about by substance abuse or physical or emotional disability and who had taken steps toward rehabilitation were suspended and placed on a structured probation. *See In re Paauwe,* 298 Or 215, 691 P2d 97 (1984); *In re Lewelling,* 298 Or 164, 690 P2d 501 (1984); *In re Heath,* 296 Or 683, 678 P2d 736 (1983); *In re Hereford,* 295 Or 604, 668 P2d 1217 (1983); *In re Varnes,* 285 Or 463, 591 P2d 366 (1979); *In re Richard F. Crist,* 258 Or 88, 481 P2d 74 (1971); *see also In re Loew,* 292 Or 806, 642 P2d 1171 (1982) (in addition to neglect, the lawyer was guilty of misrepresenting the progress of the case and intentionally failing to perform a contract for legal services; he suffered from "burn-out" syndrome); *In re Dan Dibble,* 257 Or 120, 478 P2d 384 (1970) (lawyer guilty of numerous court appearances while drunk; readmission was contingent on a showing of rehabilitation); *In re Ronald L. Ricketts,* 249 Or 575, 439 P2d 873 (1968) (lawyer guilty of false representations to a client and concocting imaginary litigation and dismissal to appease client; his mental problems caused his misconduct).

The significant difference between these cases and the present one is the gravity of the misconduct. As these cases indicate, we have imposed a period of probation in addition to suspension in cases of less serious violations that would

---

[20] *In re Germundson,* 301 Or 656, 663, 724 P2d 793 (1986), involved conflicts of interest and accepting loans from a client. We imposed a 63-day suspension and a three-year probation with conditions to monitor alcohol rehabilitation.

not normally require disbarment. In cases where disbarment is the norm, we hold that drug or alcohol dependency will not reduce that sanction.

Upon *de novo* review, we find the accused guilty of DR 1-102(A)(3), DR 1-102(A)(4) [four counts], DR 1-103(C) [three counts], DR 6-101(A)(3) [three counts], DR 7-101(A)(2) [two counts], DR 7-101(A)(3), DR 9-102(A), DR 9-102(B)(3) [two counts] and DR 9-102(B)(4).

The accused is disbarred. The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).